# EXHIBIT B

# EMPLOYMENT AGREEMENT

This Employment Agreement ("***Agreement***"), dated July 17, 2023 (the "***Commencement Date***"), is made by and between Christopher Ives ("***Executive***") and Levo Funding, Inc. (the "***Company***," and together with Executive, the "***Parties***").

WHEREAS, the Company desires to employ Executive, and Executive desires to be employed by the Company, on the terms and conditions set forth in this Agreement; and

WHEREAS, Executive acknowledges that (i) Executive's employment with the Company will provide Executive with trade secrets of, and confidential information concerning, the Company and its subsidiaries and affiliates (collectively, the "***Company Group***"), and (ii) the covenants contained in this Agreement are essential to protect the business and goodwill of the Company Group.

NOW, THEREFORE, in consideration of the promises and the respective covenants and agreements of the Parties set forth below, and intending to be legally bound hereby, the Parties agree as follows:

1. <u>Position and Duties</u>.

1.1.    Executive shall be employed on a full-time basis as Chief Executive Officer of the Company. He will report directly to the Board of Directors of the Company (the "***Board***"). He will at all times, faithfully, industriously and to the best of his ability, perform all duties that may be required of him by virtue of his position as Chief Executive Officer of the Company, and he will abide by all duties set forth in the Company's Bylaws and in policy statements issued by the Board. He is hereby vested with authority to act on behalf of the Board in keeping with policies adopted by the Board, as amended from time to time. In addition, he shall perform in the same manner any special duties assigned or delegated to him by the Board. During the Employment Term, Executive shall devote his full business time and attention to the faithful performance of his duties to the Company Group. Executive shall comply with the Company's policies and procedures in all material respects.

1.2.    Notwithstanding the foregoing, nothing contained in this <u>Section 1</u> shall prevent or limit Executive's right to manage Executive's personal investments on Executive's own personal time, including the right to make passive investments in the securities of any publicly held entity so long as Executive's aggregate direct and indirect interest does not exceed five percent (5%) of the issued and outstanding securities of any class of securities of such publicly held entity and so long as such activities do not materially interfere with Executive's duties for the Company.

2. <u>Term of Employment</u>. The employment of Executive under this Agreement shall be for a three (3) year term commencing on the date hereof (the "***Term***"), unless terminated earlier in accordance with the provisions of <u>Section 4</u> of this Agreement. This Agreement shall automatically renew for successive one (1) year terms (each a "***Renewal Term***") unless either party notifies the other in writing, at least sixty (60) days prior to the expiration of the Term or any subsequent Renewal Term then in effect, that this Agreement shall not renew, or unless terminated earlier in accordance with <u>Section 4</u> (the Term and any successive Renewal Terms collectively, the "***Employment Term***"). Upon Executive's termination of employment with the Company for any reason, Executive's other positions within the Company Group, if any, shall terminate

automatically, Executive shall automatically cease to be an officer, director and manager of each member of the Company Group, and Executive shall promptly execute any reasonable or necessary documents to effectuate the same.

3. <u>Compensation and Benefits</u>.

3.1. <u>Initial Ninety (90) Day Salary</u>. Executive's total compensation for the initial ninety (90) day period, from July 17, 2023 to October 15, 2023, shall be Sixty Two Thousand Five Hundred Dollars ($62,500.00)(less applicable withholdings and deductions) and shall be payable by the Company in regular co-equal installments in accordance with the Company's general payroll practices in effect from time to time. Executive's position is exempt and Executive will not be eligible for overtime pay.

3.2. <u>Base Salary</u>. Executive's first year base salary starting on October 16, 2023 shall be Three Hundred Fifty Thousand Dollars ($350,000.00) per annum (less applicable withholdings and deductions). Executive may be entitled to merit increases in his base salary as the Board may determine, in its sole discretion, from time to time (as adjusted from time to time, the "***Base Salary***"). The Board may not decrease Executive's Base Salary at any time. Executive's Base Salary shall be payable by the Company in regular co-equal installments in accordance with the Company's general payroll practices in effect from time to time. Executive's position is exempt and Executive will not be eligible for overtime pay.

3.3. <u>Bonus Compensation</u>. In addition to the Base Salary, Executive may be entitled to additional, variable compensation (the "***Bonus Compensation***"), with a target equal to forty five percent (45%) of Executive's Base Salary for the applicable year (the "***Target Bonus***"). Bonus Compensation shall be paid each calendar year during the Employment Term subject to Executive's continued employment through January 1 following the calendar year in respect of which such bonus is earned (the "***Bonus Year***"). Executive's annual Bonus Compensation shall be calculated based on and shall be paid if Executive meets or achieves established qualitative and quantitative performance targets and objectives reasonably determined by the Board. The Bonus Compensation shall be paid, if earned, in one lump sum cash payment within fifteen (15) days after the Company's completion of its fiscal year audit for the period to which such Bonus Compensation relates, but in no event later than June 30 of the year following the Bonus Year.

3.4. <u>Other Benefits</u>. Executive shall be eligible to participate in all of the Company's employee benefit programs generally available to similarly-situated senior executive employees of the Company Group, as they may be in effect from time to time at the Company, subject to the terms and conditions of the relevant plan documents. The Company reserves the right to modify, suspend, or discontinue any and all such plans at any time without recourse by Executive. During the Employment Term, Executive shall be entitled to paid vacation and holidays in accordance with the Company's policies as in effect from time to time.

3.5. <u>Location; Expenses</u>. Executive shall be permitted to work and provide services in locations that Executive and the Board agree upon; <u>provided</u>, <u>however</u>, that Executive shall be expected to travel as necessary in connection with the fulfillment of Executive's duties hereunder. The Company shall reimburse Executive for all reasonable, ordinary, and necessary documented travel (other than commuting costs to Executive's primary office location), entertainment, and other out-of-pocket expenses that Executive incurs on behalf of the Company in the course of

performing his duties hereunder, in accordance with the Company's normal policies and provisions regarding such reimbursements as in effect from time to time.

4.  Termination.

4.1.    Termination. Executive's employment under this Agreement shall continue until terminated pursuant to this Section 4.

(a)    By the Company for Cause.  At any time during the Employment Term the Company may immediately terminate the Employment Term and Executive's employment hereunder for Cause (as defined below) upon written notice by the Company to Executive. For the purposes of this Section 4.1(a), the term "*Cause*" shall be defined as follows:

(i)    Executive's material breach of the terms of, or Executive's obligations under, this Agreement or a breach of any covenants by which Executive may be bound, including but not limited to those set forth in Section 6 below;

(ii)    Executive's gross negligence in the performance or intentional non-performance of Executive's duties to the Company Group, which, if curable, Executive fails to cure within thirty (30) days after receipt of a written notice from the Company setting forth with reasonable particularity the gross negligence or intentional non-performance;

(iii)    Executive's violation of the Company's, or, to the extent applicable to Executive, any member of the Company Group's code of conduct or other compliance policies (including, but not limited to, policies prohibiting sexual harassment, discrimination, substance abuse, workplace violence, or threatened violence);

(iv)    without limiting the preceding clause (C), Executive's material breach of the Company's or, to the extent applicable to Executive, any member of the Company Group's, written policies or procedures;

(v)    Executive's conviction of or Executive's pleading guilty or nolo contendere to a felony or a crime of moral turpitude;

(vi)    Executive's commission of an act involving theft, willful and material misrepresentation, deceit, dishonesty, fraud, perjury or embezzlement, or other misleading or unlawful conduct with regard to the Company in connection with Executive's duties;

(vii)    Executive's repeated absence from work without a reasonable excuse (after receiving reasonable notice);

(viii)    Executive's refusal to follow the reasonable directions of the Board, which refusal has not been cured within thirty (30) days after Executive has received a written notice from the Company setting

3

forth the way in which Executive has not followed the reasonable directions of the Board;

(ix) Executive's misconduct unrelated to the Company having, or likely to have, a material negative impact on the Company or any member of the Company Group (economically or reputationally);

(x) Executive's material breach of Executive's fiduciary duties as an executive, officer, trustee, or director of the Company, insider dealings, and/or usurpation of corporate opportunities belonging to the Company; or

(xi) Executive using, distributing or being under the influence of drugs or other banned or illegal substances (other than prescription medicine to the extent such medicine is taken in accordance with its directions or under the supervision of a physician or over-the-counter medication when used in accordance with the label for such medication).

(b) <u>Death or Disability</u>. Executive's employment shall automatically terminate immediately upon the death of Executive. In the event that Executive suffers a Disability during his employment and is unable to continue to perform substantially all of Executive's duties and responsibilities under this Agreement, either with or without reasonable accommodation, the Company will continue to pay Executive's Base Salary and to provide Executive benefits in accordance with <u>Section 3.3</u> above, to the extent permitted by plan terms, for up to twelve (12) weeks during any period of Disability within three hundred sixty-five (365) consecutive calendar days. If Executive is unable to return to work with or without a reasonable accommodation after such twelve (12) week period, the Company may terminate Executive's employment, upon notice to Executive. As used herein, the term "Disability" shall mean the inability of Executive, due to a physical or mental illness, injury, accident, or condition, to perform the essential functions of her position, with or without reasonable accommodation, for a period of ninety (90) days during any period of one hundred eighty (180) consecutive calendar days. A determination of Disability shall be made by a physician satisfactory to both Executive and the Company, provided, that if Executive and the Company do not agree on a physician, Executive and the Company shall each select a physician, which two physicians shall together select a third physician, whose determination as to disability shall be binding on all Parties.

(c) <u>Non-Renewal</u>. Upon not less than sixty (60) days' written notice prior to the expiration of the Term or any Renewal Term, as applicable, at the election of either Party not to enter into a or another Renewal Term, pursuant to <u>Section 2</u>.

(d) <u>By the Company without Cause or By the Executive Voluntarily</u>. At any time during the Employment Term, following not less than sixty (60) days' prior written notice, the Company may terminate the Employment Term and Executive's employment hereunder without Cause (that is, other than for reasons constituting Cause, or as a result of Executive's death or Disability, or upon election not to enter into a Renewal Term, in accordance with <u>Sections 4.1(a)</u>, <u>4.1(b)</u> or <u>4.1(c)</u>, respectively) or the Executive may terminate the Employment Term voluntarily at any time.

4

4.2. Effect of Termination.

(a)    Termination by the Company for Cause; by Executive Voluntarily; or upon Non-Renewal. In the event Executive's employment is terminated by the Company for Cause pursuant to Section 4.1(a), or by the Executive voluntarily pursuant to Section 4.1(d), or by the Company or Executive upon notice of non-renewal pursuant to Section 4.1(c), the Company shall pay to Executive his Base Salary through the last day of his actual employment by the Company, any accrued and unused vacation, and any unreimbursed business expenses in accordance with the Company's expense reimbursement policy (the "***Accrued Obligations***"). Executive shall not accrue any additional compensation (including Base Salary or Bonus) or other benefits under this Agreement following such termination from employment, unless as otherwise provided under the applicable benefit plan or arrangement, or under applicable law. All other benefits, if any, due to Executive following Executive's termination of employment pursuant to this Section 4.2(a) shall be determined in accordance with the plans, policies, and practices of the Company; provided, that Executive shall not participate in any severance plan, policy, or program of the Company that would result in a duplication of benefits.

(b)    Termination for Death or Disability. If Executive's employment is terminated by death or due to Executive's Disability, pursuant to Section 4.1(b), Executive or his estate shall be entitled to receive the Accrued Obligations. All other benefits, if any, due to Executive or Executive's estate following Executive's termination due to Executive's death or Disability shall be determined in accordance with the plans, policies, and practices of the Company; provided, that Executive (or his estate) shall not participate in any severance plan, policy, or program of the Company that would result in a duplication of benefits. Executive or his estate shall not accrue any additional compensation (including Base Salary or Bonus) or other benefits under this Agreement following such termination of employment, except for any benefits to which Executive (or his estate) is entitled pursuant to the terms of the employee benefit plans of the Company in which Executive is participating immediately prior to such termination.

(c)    Termination at the Election of the Company. In the event Executive's employment is terminated at the election of the Company without Cause pursuant to Section 4.1(d), the Company shall pay to Executive (i) the Accrued Obligations, and (ii) provided that Executive executes and does not revoke a valid waiver and release of all claims that Executive may have against the Company Group in a form and of a substance to be provided by the Company (which waiver and release of all claims shall contain appropriate carve-outs for amounts payable pursuant to this Agreement and any rights Executive may have under any benefit plans or programs of the Company Group), Executive's Base Salary for a period of twelve (12) months, minus applicable deductions and withholdings, and payable in regular co-equal installments in accordance with the Company's regular payroll practices, with the first installment to be paid on the Company's first regularly scheduled payroll date that is at least fourteen (14) days after the effective date of the waiver and release of claims.  All other benefits, if any, due to Executive following a termination pursuant to Section 4.1(d) shall be determined in accordance with the plans, policies, and practices of the Company; provided, that Executive shall not participate in any severance plan, policy, or program of the Company to the extent such participation will result in a duplication of benefits. Other than as provided in this Section 4.2(c), Executive shall not accrue any additional compensation (including any Base Salary or Bonus Compensation) or other benefits under this Agreement following such termination from employment.

5.    <u>Company Policies and Procedures</u>. Executive shall comply with all Company policies and procedures ("***Policies and Procedures***") as the same may be adopted, amended, or promulgated by the Company from time to time. To the extent of any conflict between the terms of this Agreement and the Policies and Procedures, this Agreement shall control.

6.    <u>Executive's Obligations</u>.

6.1.    <u>Confidential Information</u>. Executive acknowledges that the Company Group has a legitimate and continuing proprietary interest in the protection of its confidential information and that it has invested substantial sums and will continue to invest substantial sums to develop, maintain, and protect such confidential information. During the Employment Term and at all times thereafter, Executive shall not, except with the written consent of the Company or in connection with carrying out Executive's duties or responsibilities hereunder, furnish or make accessible to any third party or use for Executive's own benefit any trade secrets, or confidential or proprietary information of the Company Group, whether maintained in digital form or hardcopy, including financial data, investment data, commercial data, all personal information, personnel information, trade secrets, business plans, business models, organizational structures and models, business strategies (including but not limited to trading and recruiting strategies), formulas, algorithms, marketing plans, information and materials, processes, inventions, devices, training manuals, computer programs, databases, investor lists (including, without limitation, any information regarding the Company Group's current or prospective clients, customers, or investors), analytical models, investment and economic research and analysis, investment proposals, templates and agreements, and all other proprietary or confidential information concerning or provided by or on behalf of the Company Group, including, without limitation, information regarding any actual or prospective business opportunities, employment opportunities, finances, and investments (hereafter referred to as "***Confidential Information***"); <u>provided</u>, that such Confidential Information shall not include information that, at the time of disclosure or use, was generally available to the public other than by a breach of this Agreement. Executive agrees that any materials developed by him in connection with his employment by the Company shall be the property of the Company, and the Company will solely retain and own all rights in such materials. Nothing in this Agreement limits, restricts or in any other way affects Executive's communicating with any governmental agency or entity, or communicating with any official or staff person of a governmental agency or entity, concerning matters relevant to the governmental agency or entity. Notwithstanding anything herein to the contrary, in accordance with the Defend Trade Secrets Act, 18 U.S.C. § 1833(b), and other applicable law, nothing in this Agreement or any other agreement or policy shall prohibit Executive from, or expose Executive to criminal or civil liability under federal or state trade secret law for: (A) filing a charge or complaint with, communicating with, participating in any investigation or proceeding that may be conducted by or otherwise directly or indirectly sharing any Company Group member's trade secrets or other Confidential Information (except information protected by any Company Group member's attorney-client or work product privilege) with law enforcement, an attorney, or any federal, state or local government agencies, regulators or officials (including the Equal Employment Opportunity Commission, the Securities and Exchange Commission and equivalent state and local agencies), for the purposes of investigating or reporting a suspected violation of law, whether in response to a subpoena or otherwise, without notice to the Company Group, or (B) disclosing trade secrets in a complaint or other document filed in connection with a legal claim, or to Executive's attorney for use in a whistleblower retaliation lawsuit, provided that any filing is made under seal. Further, nothing herein shall prevent Executive from participating in any action seeking to rectify or address

6

harassment, sexual harassment, or discrimination, from making good faith based allegations relating to the same, or from discussing or disclosing information related to Executive's general job duties or responsibilities and/or regarding employee wages or benefits.

6.2.    Property of the Company. Executive acknowledges and agrees that "*Company Property*" shall mean all property and resources of the Company Group, including, without limitation, Confidential Information, memoranda, notes, lists, records and other documents or papers (and all copies thereof), the Company Group's products, computer systems and all software, e-mail, web pages and databases, telephone and facsimile services, and all other administrative and/or support services provided by the Company Group.

6.3.    Nondisparagement. Except as provided in Section 6.1 above, as within the performance of Executive's lawful and authorized duties within the scope of Executive's employment, or as otherwise approved in writing by the Board, Executive agrees that, during the Employment Term and at all times thereafter, Executive will not, whether in private or in public, whether orally, in writing or otherwise, whether directly or indirectly (i) make or publish negative or disparaging remarks that in any way relate to any member of the Company Group, or any of their respective officers, directors, employees, or agents; (ii) comment upon or discuss any member of the Company Group, or their respective officers, directors, employees and agents, with any media source, including but not limited to any reporters, television, radio, movie, theatrical, internet web blog or web site, social media, national or local newspaper, magazine, or any other news organization, news outlet, or publication; (iii) publish, or draft for publication, any written material whatsoever related to any member of the Company Group or their respective officers, directors, employees and agents; or (iv) aid, assist or direct any other person or entity to do any of the foregoing. Notwithstanding the foregoing, nothing herein shall prevent either Executive from testifying truthfully in any legal or administrative proceeding where such testimony is compelled or requested, or from otherwise complying with applicable legal requirements.

6.4.    Legal Process. Except as provided in Section 6.1 above, if Executive receives a subpoena or process from any person or entity (including, but not limited to, any governmental agency) that would or may require Executive to disclose documents or information or provide testimony (in a deposition, court proceeding, or otherwise) regarding, in whole or in part, the Company Group or any Confidential Information or Company Property, Executive shall: (a) notify the Company of the subpoena or other process as promptly as practicable, so long as Executive has the legal right to provide such notice; and (b) to the maximum extent possible, not make any disclosure until the Company Group has had a reasonable opportunity to contest the right of the requesting person or entity to such disclosure, limit the scope or nature of such disclosure, and/or seek to participate in the proceeding or matter in which the disclosure is sought.

6.5.    Cooperation and Assistance. Executive agrees that during the Emplyment Term and thereafter, he shall, upon reasonable notice, furnish such information and proper assistance to the Company Group as it may reasonably request in connection with any existing or future investigation by or legal action(s) involving the Company Group, whether administrative, civil, or criminal in nature, in which and to the extent the Company Group reasonably deems Executive's cooperation necessary, without further compensation; provided, however, that Executive's cooperation shall be subject to reasonable accommodation to Executive's schedule and, if this cooperation requires Executive to incur expenses for travel and lodging, such expenses will be reimbursed as long as those expenses are reasonable and approved by the Company in advance.

6.6.     Enforcement. Executive acknowledges and agrees that the foregoing provisions and restrictions contained in this Section 6 are reasonable and necessary for the protection of the Company Group and their businesses. These obligations are not limited in time to the duration of Executive's employment and rather shall survive the termination of Executive's employment, irrespective of the reason for its termination. Executive agrees that his breach of any of the foregoing provisions will result in irreparable injury to the Company Group, that monetary relief alone will be inadequate to redress such a breach, and further that the Company Group shall be entitled to seek an injunction to prevent and/or remedy such a breach or threatened breach (without first having to post a bond or other security). In any proceeding for an injunction and upon any motion for a temporary or permanent injunction ("***Injunctive Action***"), the Company Group's right to receive monetary damages shall not be a bar or interposed as a defense to the granting of such injunction. The Company Group's right to seek an injunction is in addition to, and not in lieu of, any other rights and remedies available to the Company Group under law or in equity. Any Injunctive Action may be brought in any appropriate court located in the State of California or, if federal jurisdiction is appropriate, in the United States federal court located in the State of California. Executive hereby irrevocably submits to the jurisdiction of such courts in any Injunctive Action and waives any claim or defense of inconvenient or improper forum or lack of personal jurisdiction under any applicable law or decision. Upon the issuance (or denial) of an injunction, the underlying merits of any dispute will be resolved in accordance with the arbitration provisions of Section 7 of this Agreement.

7.   Arbitration.

7.1.     The Parties irrevocably and unconditionally agree that any past, present, or future dispute, controversy, or claim arising under or relating to this Agreement, arising under any federal, state, or local statute, regulation, law, ordinance, or the common law (including but not limited to any law prohibiting discrimination), and/or under any other confidentiality or non-disclosure agreement, and/or in connection with Executive's employment, or termination thereof, involving Executive on the one hand and the Company, any other member of the Company Group, or any of its or their respective officers, directors, employees or agents on the other hand, including both claims brought by Executive and claims brought against Executive, shall be submitted to binding arbitration as provided herein. Any arbitration pursuant to this Agreement shall be administered by the American Arbitration Association ("***AAA***"); shall be conducted in accordance with the AAA Arbitration Rules for Employment Disputes, as modified herein; and shall be conducted by a single arbitrator, who shall have experience in employment disputes. Such arbitration shall be conducted in the State of California, and the arbitrator will apply California law, including federal law as applied in California courts. The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, and/or formation of this Agreement, including but not limited to any dispute as to whether (i) a particular claim is subject to arbitration hereunder and/or (ii) any part of this Section 7 is void or voidable. The arbitral award shall be in writing, state the reasons for the award, and be final and binding on the Parties. The arbitration shall be conducted on a strictly confidential basis, and no Party, arbitrator, or other person or entity shall disclose the existence of a claim, the nature of a claim, any documents, correspondence, pleadings, briefing, exhibits, or information exchanged or presented in connection with such a claim, or any rulings, decisions, or results of any claim or argument (collectively, "***Arbitration Materials***"), to any third party, with the sole exception of the Parties' legal counsel, who also shall be bound by these confidentiality terms. In the event either Party substantially prevails in an action involving a breach

8

of any provision of <u>Section 6</u>, such Party shall be entitled to an award including its reasonable attorneys' fees and costs, to the extent such an award is permitted by law.

7.2.    In the event of any court proceeding to challenge or enforce an arbitrator's award, the Parties hereby consent to the exclusive jurisdiction of the state and federal courts sitting in California; agree to exclusive venue in that jurisdiction; and waive any claim that such jurisdiction is an inconvenient forum. There shall be no interlocutory appeals to any court, or any motions to vacate any order of the arbitrator that is not a final award dispositive of the arbitration in its entirety, except as required by law. The Parties agree to take all steps necessary to protect the confidentiality of the Arbitration Materials in connection with any court proceeding, agree to use their best efforts to file all Confidential Information (and documents containing Confidential Information) under seal, and agree to the entry of an appropriate protective order encompassing the confidentiality terms of this Agreement.

8.  <u>Miscellaneous</u>.

8.1.    <u>Executive's Representations</u>. Executive hereby represents and warrants to the Company that (i) Executive has read this Agreement in its entirety, fully understands the terms of this Agreement, has had the opportunity to consult with counsel prior to executing this Agreement, and is signing the Agreement voluntarily and with full knowledge of its significance; (ii) the execution, delivery, and performance of this Agreement by Executive does not and shall not conflict with, breach, violate, or cause a default under any contract, agreement, instrument, order, judgment, or decree to which Executive is a party or by which he is bound; (iii) Executive is not a party to or bound by an employment agreement, non-compete agreement, or confidentiality agreement with any other person or entity which would be breached by entering into this Agreement or interfere in any material respect with the performance of her duties hereunder; and (iv) Executive has not engaged in any conduct (or aided or assisted any other person or entity to engage in any conduct or cover-up of such conduct), whether within the scope of Executive's employment at a previous employer or otherwise, that could cause any damage to the Company's or any of its subsidiaries' or affiliates' reputation or business or the Company's or any of its subsidiaries' or affiliates' employees, including, but not limited to, any conduct constituting sexual misconduct, sexual harassment, harassment or discrimination; and (v) Executive shall not use any confidential information or trade secrets of any person or party other than the Company Group in connection with the performance of her duties hereunder. Executive agrees to immediately notify the Board, in writing, if any representation in this Section 8.1 is or becomes untrue or inaccurate at any time.

8.2.    <u>Waiver</u>. No provision of this Agreement may be modified, waived, or discharged unless such waiver, modification, or discharge is agreed to in a writing signed by Executive and an executive officer of the Company (other than Executive). No waiver by either Party at any time of any breach of the other Party of, or compliance with, any condition or provision of this Agreement to be performed by such other Party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

8.3.    <u>Successors and Assigns</u>. Executive may not assign his rights or interests under this Agreement. This Agreement may be assigned by the Company to an affiliated entity or to any successor assignee of the Company with or without Executive's consent, and shall be binding on and inure to the benefit of the successors and assigns of the Company.

8.4. <u>Governing Law</u>. The provisions of this Agreement shall be governed by and construed and enforced in accordance with the internal, substantive laws of the State of California, including federal law as applied in California courts, without regard to the principles of conflicts of laws thereof.

8.5. <u>Complete Agreement; Survival</u>. This Agreement embodies the complete agreement and understanding between Executive and the Company and supersedes and preempts any prior understandings, agreements, or representations by or between the Parties, written or oral, which may have related to the subject matter hereof in any way. If any term or provision of this Agreement (or any portion thereof) is determined by an arbitrator or court of competent jurisdiction to be invalid, illegal, or incapable of being enforced, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect. Upon a determination that any term or provision (or any portion thereof) is invalid, illegal, or incapable of being enforced, the Parties agree that an arbitrator reviewing court shall have the authority to "blue pencil" or modify this agreement so as to render it enforceable and effect the original intent of the Parties to the fullest extent permitted by applicable law. The provisions set forth in <u>Sections 6</u> and <u>7</u> of this Agreement shall survive the termination of Executive's employment for any reason.

8.6. <u>Advice of Counsel and Construction</u>. Each Party acknowledges that such Party had the opportunity to be represented by counsel in the negotiation and execution of this Agreement. Accordingly, the rule of construction of contract language against the drafting party is hereby waived by each Party.

8.7. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

8.8. <u>Notices</u>. Any notices provided for in this Agreement shall be in writing and shall be effective when delivered in person or deposited in the United States mail, postage prepaid, and addressed to the Executive at his last known address on the books of the Company or, in the case of the Company, to it at its principal place of business, attention of the Chairman of the Board, or to such other address as either party may specify by notice to the other actually received.

8.9. <u>Section 409A</u>. Notwithstanding anything herein to the contrary, this Agreement is intended to be interpreted and applied so that the payment of the benefits set forth herein either shall  be exempt from the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "***Code***"), or shall comply with the requirements of such provision. Notwithstanding anything in this Agreement or elsewhere to the contrary, distributions upon termination of Executive's employment may only be made upon a "separation from service" as determined under Section 409A of the Code. Each payment under this Agreement or otherwise shall be treated as a separate payment for purposes of Section 409A of the Code. In no event may Executive, directly or indirectly, designate the calendar year of any payment to be made under this Agreement or otherwise which constitutes a "deferral of compensation" within the meaning of Section 409A of the Code. All reimbursements and in-kind benefits provided under this Agreement shall be made or provided in accordance with the requirements of Section 409A of the Code. To the extent that any reimbursements pursuant to this Agreement or otherwise are taxable to Executive, any reimbursement payment due to Executive shall be paid to Executive on or before the last day of Executive's taxable year following the taxable year in which the related expense was incurred;

provided that, Executive has provided the Company written documentation of such expenses in a timely fashion and such expenses otherwise satisfy the Company's expense reimbursement policies. Reimbursements pursuant to this Agreement or otherwise are not subject to liquidation or exchange for another benefit and the amount of such reimbursements that Executive receives in one taxable year shall not affect the amount of such reimbursements that Executive receives in any other taxable year. To the extent that the Company determines that any provision of this Agreement would cause the Executive to incur any additional tax or interest under Code Section 409A, the Company shall be entitled to reform such provision in consultation with Executive's counsel to attempt to comply with or be exempt from Code Section 409A through good faith modifications. To the extent that any provision hereof is modified in order to comply with Code Section 409A, such modification shall be made in good faith and shall, to the maximum extent reasonably possible, maintain the original intent and economic benefit to Executive and the Company without violating the provisions of Code Section 409A.  Notwithstanding any of the foregoing to the contrary, the Company and its respective officers, directors, employees, or agents make no guarantee that the terms of this Agreement as written comply with, or are exempt from, the provisions of Code Section 409A, and none of the foregoing shall have any liability for the failure of the terms of this Agreement as written to comply with, or be exempt form, the provisions of Code Section 409A.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Parties have acknowledged the acceptance of the terms of this Agreement as of the date first set forth above:

LEVO FUNDING, INC.

By: _____

Name: Alan Miller

Title: President

EXECUTIVE

_____

Christopher Ives

[Signature Page to Employment Agreement]