# EXHIBIT C

1  Brian E. Koegle (SBN 218800)
   bkoegle@koeglelaw.com
2  Lucas E. Rowe (SBN 298697)
   lrowe@koeglelaw.com
3  Ransom D. Boynton (SBN 333262)
   rboynton@koeglelaw.com
4  **KOEGLE LAW GROUP, APC**
5  27240 Turnberry Lane, Suite 200
   Valencia, California 91355
6  T: 661-362-0813
7  Attorneys for Plaintiff
   Christopher Ives

8

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
    9/10/2024 11:12:48 AM
  Clerk of the Superior Court
  By E. Deavers          ,Deputy Clerk

9           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10              **FOR THE COUNTY OF SAN DIEGO**

11

12  CHRISTOPHER IVES,

13              Plaintiff,

14        vs.

15  LEVO FUNDING, INC., a Delaware
16  corporation; and DOES 1 to 50, inclusive,

17              Defendants.

18

Case No.:    24CU011858N

COMPLAINT FOR DAMAGES:

1. BREACH OF WRITTEN CONTRACT
2. BREACH OF THE COVENANT OF
   GOOD FAITH AND FAIR DEALING
3. WRONGFUL TERMINATION IN
   VIOLATION OF PUBLIC POLICY
4. RETALIATION (CAL. LABOR CODE
   §1102.5)
5. RETALIATION (CAL. GOVT CODE
   §12940, ET SEQ.)
6. DEFAMATION – SLANDER
7. INTENTIONAL INFLICTION OF
   EMOTIONAL DISTRESS
8. FRAUD IN THE INDUCEMENT
9. FRAUD – FALSE PROMISE
10. FRAUD – MATERIAL
    MISREPRESENTATION

**JURY TRIAL DEMANDED**

24        COMES NOW PLAINTIFF, CHRISTOPHER IVES ("Ives"), by and through his

25  attorneys, alleges and complains as follows:

26

27

28

1
**COMPLAINT FOR DAMAGES**

## PARTIES

1.      Plaintiff, CHRISTOPHER IVES ("IVES" or "Plaintiff"), is an individual with his principal place of residence in San Diego County, La Mesa, California, and was employed as a remote worker for Defendant, Levo Funding, Inc.

2.      Defendant LEVO FUNDING, INC. ("LEVO") was and is a Delaware for-profit corporation, authorized to do business in the state of California, with its principal place of business in 27 Golf Dr., Aliso Viejo, CA 92656. At all relevant times, LEVO regularly employed five or more employees and was covered under applicable State and Federal employment anti-retaliation and anti-discrimination laws.

3.      Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES 1-50, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged. LEVO and the Doe Defendants are collectively referred to herein as "Defendants").

4.      Plaintiff is informed and believes, and thereon alleges, that at all times relevant to this Complaint, all Defendants, including fictitiously named Defendants, were the agents, servants, alter egos, affiliates, employers, principals and/or employees of each other and engaged in the conduct alleged herein within the course, scope and authority of their respective capacities.

5.      Venue is proper in this Judicial District because Defendant has a principal place of business in San Diego County, California; and Defendants' obligations under the employment laws and regulations were breached principally in San Diego County.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.      A complaint was filed on behalf of Plaintiff with the California Civil Rights Department (CRD) against Defendants pursuant to the California Fair Employment Housing Act (FEHA) — Government Code section 12900 et seq. —alleging that the acts described in the complaint violated FEHA. The CRD issued Plaintiff a "right-to-sue" letter on or around September 9, 2024.

**COMPLAINT FOR DAMAGES**

## GENERAL ALLEGATIONS

7.      On or around July 17, 2023, Ives began working for LEVO as the Chief Executive Officer, pursuant to a written Employment Agreement of the same date ("the Agreement"). A true and correct copy of the Employment Agreement is attached hereto as Exhibit "A". As part of his duties, Plaintiff was responsible for overseeing all aspects of company operations in compliance with LEVO's Board of Directors' policies and procedures. The term of the Agreement was for a period of three (3) years, commencing on July 17, 2023 ('the Term') (See Agreement, §2). Pursuant to the Agreement, either LEVO or IVES could terminate the Agreement, prior to the expiration of the Term, in very limited circumstances (See Agreement, §4).

8.      Prior to executing the Agreement and beginning to work for LEVO, IVES was approached by Alan Miller and Abe Miller of Miller Family Industries ("MFI"), to pursue a new business venture owned and controlled by MFI. At the time of MFI's solicitation of IVES, he was working for a competitor in the merchant cash advance (MCA) industry, a business funding model that provides short-term loans to businesses in exchange for a percentage of their future sales.

9.      During a meeting on or about May 1, 2023, MFI represented that they were looking to deploy over $50,000,000 into the MCA industry, by lending money, rather than brokering deals. MFI needed assistance in breaking into the industry, and IVES and his team, had substantial experience and success within this marketplace. MFI offered IVES and his colleagues ownership interest in the new business venture, known as Levo Funding, Inc., along with full operational control, from day one, in an effort to sway IVES to leave his current employment and start with the yet-to-be founded business. MFI specifically pledged an original investment of $4,500,000 toward LEVO, with a written pledge of an additional $2,000,000-5,000,000 per month, in addition to all operating costs, in order to seed the initial round of lending.

10.     Over the ensuing two months, IVES and others, negotiated salaries, set procedural expectations, presented a full business plan and investment strategy, and set a course for the new business venture. By July 23, 2023, IVES had begun to staff the company, and began working in earnest toward the investment strategy proposed, and accepted by MFI.

11.     Beginning in August 2024, IVES began addressing funding concerns with the LEVO Board of Directors ("the Board"), and specifically Abe and Alan Miller, over the lack of

new funding to allow LEVO employees to adequately perform their jobs, and deploy funding, consistent with the strategic investment planning approved by the Board.

12.     Promises of funding were consistently made, and consistently broken by MFI over the course of the next five months. Repeated promises of "the check is in the mail" were made, which hindered LEVO's access to capital, and thus, limited its ability to grow based upon projections.

13.     Notwithstanding the lack of resources, IVES and his team continued to persevere, managing growth and returns on investment above the projected totals in the initial strategic plan. At no time did IVES fail to deliver on the promises or pledges that he made to MFI, despite the impediments on funding.

14.     In mid-December 2023, IVES had a discussion with Alan Miller, about the source of funds for the lending plan agreed upon for LEVO.  Miller became agitated and recanted on his previous pledges and promises to provide adequate funding, pursuant to the strategic plan. Following that conversation with Alan Miller, in early January 2024, a discussion between IVES and Joseph Schoenfeld, MFI's Controller, over delivery of promised funds, to allow for investment.  This was the first time that IVES felt that he had been "set up to fail" by MFI in this new venture.  At this point, IVES began inquiring directly with Alan Miller to discuss a change in scope of the business model, and to determine a more "trimmed down" approach to growth given the funding deficiencies that had continued since the business began. IVES was concerned and communicated to Alan Miller and Schoenfeld that the information shared by LEVO with third-party stakeholders was being materially misrepresented, and that the company could face compliance violations, government/regulatory investigation and administrative penalties due to improper capitalization, underfunding, and false promises made to the public about LEVO's capacity to lend.

15.     Following these interactions with Alan Miller and Schoenfeld, beginning in January 2024, IVES noticed that LEVO's chief legal counsel, Jenny Merris ("Merris") became more involved in day-to-day operations, communications with the LEVO Board, and overseeing the executive team.  While Merris purported to be "helping" IVES in securing the necessary funding to allow LEVO to function properly, IVES now believes that she was integrally involved

in an attempt to undermine IVES position as CEO, and seed doubt in MFI's mind over the long-term strategy and success of the platform that had been created.

16.    Less than three weeks later, on January 31, 2024, at a previously un-noticed Board meeting, Abe Miller, on behalf of MFI, read a statement to the Board: "It is the board's decision, Christopher [IVES], that you are being terminated for cause. You are building a company larger than we had thought, as we were expecting to just fund a few deals, and collect some revenue. You can keep your board seat as you are entitled to that. We will need to terminate all office staff. Again, just to confirm, you are being terminated for cause." Since the date of this meeting, IVES was no longer involved in any board calls, meetings, decisions, or communication in any way. Merris assumed control of the operations of the company, and placed IVES on an "unpaid leave of absence" without explanation or reasoning. Rather, IVES was tasked with finding alternative investment sources, including a potential buyer for LEVO, with the understanding that MFI wanted out of the business that had just been created, and did not have the cash flow to adequately fund the business operations pitched by IVES and his team, and approved by MFI more than eight months earlier.

17.    On February 21, 2024, IVES was contacted by Merris via telephone and officially terminated as an employee of LEVO.  Merris indicated that the termination was deemed "for cause" pursuant to the Agreement.  When IVES asked for further detail on why the termination was deemed "for cause", Merris had no material response, other than to state that "Alan [Miller] has a personal vendetta" against IVES.  No other LEVO executives were terminated at or near the date of IVES' termination.  IVES is informed and believes, and based thereon alleges that the exact day he was officially terminated, MFI provided the funding that had been promised to LEVO for over three months.

**FIRST CAUSE OF ACTION**

**Breach of Written Contract**

**(Against Defendant and Does 1 through 20)**

18.    Plaintiff hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

19.     On or about July 17, 2023, the Parties entered into a valid, enforceable, and binding written Employment Agreement, a copy of which is attached hereto as Exhibit "A," and which is made a part hereof and incorporated herein by reference.

20.     In exchange for the agreements contained in the Agreement, IVES left gainful employment in reliance on the promises and covenants contained therein, including a three (3) year employment period.

21.     Plaintiff has performed and/or fulfilled his obligations and/or duties under the valid and enforceable terms of the Agreement.

22.     Plaintiff's performance of its obligations under the Agreement were excused, waived, and/or prevented by Defendant.

23.     Plaintiff has performed any and all conditions precedent that Plaintiff was required to perform under the terms Agreement, and/or all conditions precedent have been satisfied.

24.     Plaintiff's performance of any and all conditions precedent that Plaintiff was required to perform under the terms of the Agreement were excused, waived, and/or prevented by Defendant.

25.     Plaintiff is informed and believes, and on that basis herein alleges that Defendant materially and substantially breached Section 4 of the Agreement in February 2024, by wrongfully terminating the Agreement, without cause, cure or purpose.

26.     Defendant has breached and continues to materially and substantially breach the Agreement by refusing the rights and benefits bestowed by the Agreement upon Plaintiff.

27.     Plaintiff has sustained damages as a result of Defendant's numerous and continuous breaches of the Agreement in an amount to be determined and proven at trial.

28.     Plaintiff's damages flow directly from and are the natural and probable consequences of Defendant's breach.

29.     Plaintiff's damages were foreseeable and within the contemplation of the parties before, or at the time the Agreement between the parties was made.

**COMPLAINT FOR DAMAGES**

30.     Plaintiff is entitled to judgment for damages against Defendant, together with pre- and post-judgment interest thereon as allowed by law, costs of this action, and such further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (Against Defendant and Does 1 through 20)

31.     Plaintiff hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

32.     Implied in every contract is a covenant of good faith and fair dealing.  Plaintiff is informed and believes, and on that basis herein alleges that Defendant materially and substantially breached this implied covenant of good faith and fair dealing when it violated Section 4 of the Agreement beginning in or around February 2023 and continuing to date, by denying Plaintiff the benefits of employment bestowed under the Agreement.

33.     By doing so, Defendant did not act fairly and in good faith. Defendant has breached and continues to materially and substantially breach its implied covenant of good faith and fair dealing as imposed by the terms of the Agreement by the improper termination of the Agreement, and denying Plaintiff the benefits of employment bestowed in the Agreement.

34.     Plaintiff has sustained damages as a result of Defendant's numerous and continuous breaches of the Agreement in an amount to be determined and proven at trial.

35.     Plaintiff's damages flow directly from and are the natural and probable consequences of Defendant's breach. Plaintiff's damages were foreseeable and within the contemplation of the parties before, or at the time the Agreement between the parties was made.

36.     Plaintiff is entitled to judgment for damages against Defendant, together with pre- and post-judgment interest thereon as allowed by law, costs of this action, and such further relief as this Court deems just and proper.

**COMPLAINT FOR DAMAGES**

### THIRD CAUSE OF ACTION

**Wrongful Termination in Violation of Public Policy/FEHA [Cal. Gov. Code § 12940(m)]**

**(Against Defendant and Does 1 through 20)**

37.    Plaintiff hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

38.    IVES was employed by LEVO, pursuant to the terms of the Agreement. Throughout his employment with Defendant, Plaintiff performed the duties of his work assignments competently.

39.    LEVO discharged IVES, prior to completion of the Term, and without good cause. However, LEVO also failed to follow the notice and cure protocols required for a termination of the contract without good cause.

40.    Under California law, no employee can be terminated or subjected to adverse employment action for a reason that violates a fundamental public policy and/or some combination of these factors were motivating reasons for their termination. Plaintiffs termination violated the public policy of the State of California and the United States, imposing general business duties with which every business entity must comply. Defendants' conduct violated the California Constitution, the California Fair Employment and Housing Act, codified in Government Code § 12940, et seq., the California Labor Code, etc.

41.    LEVO's decision to terminate occurred approximately three weeks after IVES advised the Board of the deficiencies in funding and the inability of the business to operate in compliance with state and federal regulations due to the acts and omissions of MFI, Abe Miller and Alan Miller.  As such, the decision to terminate was in violation of the retaliation statutes set forth in Cal. Government Code §12940, et seq. Such complaints are in the best interests of the public, by virtue of the advertising and marketing done by LEVO indicating that it was a properly-funded MCA lender.

42.    As a direct, foreseeable, and proximate result of Defendant's conduct as alleged, Plaintiff has suffered and will continue to suffer actual damages, including lost earnings and other employment benefits, in a sum in excess of the jurisdictional limit of this Court, the exact amount of which is not yet known, which amount will be proven at trial.

**COMPLAINT FOR DAMAGES**

43.    As a direct, foreseeable, and proximate result of Defendant's wrongful acts and failures to act, Plaintiff has suffered and will continue to suffer substantial emotional distress and will incur other incidental and consequential damages and losses, all in amounts to be proven at trial. Plaintiff claims all such amounts as damages, together with prejudgment interest, pursuant to any provision of law providing for prejudgment interest.

44.    As a direct, foreseeable, and proximate result of Defendant's discriminatory and wrongful actions against Plaintiff as alleged, Plaintiff has suffered and will continue to suffer special damages that include, without limitation, loss of wages, salary, benefits, and/or additional amounts of money Plaintiff would have received but for Defendant's discriminatory and wrongful actions. Plaintiff continues to suffer the intangible loss of such employment-related opportunities as experience in the position Plaintiff held and advancement opportunities.

45.    As a direct, foreseeable, and proximate result of said wrongful acts and failures to act by Defendant, Plaintiff has suffered and will continue to suffer humiliation, shame, despair, embarrassment, depression, and mental pain and anguish, causing Plaintiff to incur damages in an amount to be proven at trial.

46.    Defendant committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice or despicable conduct. Alternatively, Defendant's wrongful conduct was carried out with a conscious disregard for Plaintiffs rights. Further, the alleged wrongful conduct was carried out and ratified by a managing agent; or an officer, a director, or a managing agent and Defendant had advance knowledge of the unfitness of its decision-maker and employed them with a conscious disregard of Plaintiffs rights and/or authorized and/or ratified their conduct. As a result, Plaintiff is entitled to recover punitive and exemplary damages commensurate with Defendant's wrongful acts and sufficient to punish and deter future similarly reprehensible conduct.

### **FOURTH CAUSE OF ACTION**

### **Retaliation [Cal. Labor Code § 1102.5]**

### **(Against Defendant and Does 1 through 20)**

47.    Plaintiff hereby incorporates by reference all the allegations contained in the, preceding paragraphs of this complaint, as though fully set forth herein.

48.    At all relevant times, Labor Code § 1102.5(a) was in full force and effect and was binding on Defendant. This law prohibits an employer, or any person acting on behalf of the employers, from discharging an employee or in any manner discriminating or retaliating against, or taking any adverse action against, an employee because, among other things, the employee disclosed information to a government or law enforcement agency, or to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties. Pursuant to Labor Code § 1102.5(f), in addition to other penalties, an employer that is a corporation or limited liability company is liable for a civil penalty not exceeding ten thousand dollars ($10,000) for each violation of this section.

49.    As alleged herein, on one or more occasions during their employment, Plaintiff engaged in protected activities, including but not limited to the following:

(a)    Reporting, opposing, and/or objecting to suspected FEHA violations.

(b)    Reporting, opposing, and/or objecting to suspected wage and hour violations.

(c)    Reporting, opposing, and/or objecting to suspected workplace safety and/or health violations.

(d)    Reporting, opposing, and/or objecting to suspected to illegal workplace activity.

In response, Defendant subjected Plaintiff to adverse employment actions, including, without limitation, termination.

50.    Plaintiffs reporting of these violations was a motivating and contributing factor for the adverse employment actions by Defendant against Plaintiff. This conduct violates Labor Code §§ 1102.5 and!102.6, and such violations were a proximate cause in Plaintiffs damages as hereinabove stated.

51.    Plaintiff is entitled to a civil penalty not to exceed $10,000.00 for Defendant's violations of Labor Code§ 1102.5.

52.    As a direct, foreseeable, and proximate result of Defendant's conduct as alleged, Plaintiff has suffered and will continue to suffer actual damages, including lost earnings and other employment benefits, in a sum in excess of the jurisdictional limit of this Court, the exact amount of which is not yet known, which amount will be proven at trial.

53.    As a direct, foreseeable, and proximate result of Defendant's wrongful acts and failures to act, Plaintiff has suffered and will continue to suffer substantial emotional distress and will incur other incidental and consequential damages and losses, all in amounts to be proven at trial. Plaintiff claims all such amounts as damages, together with prejudgment interest, pursuant to any provision of law providing for prejudgment interest.

54.    As a direct, foreseeable, and proximate result of Defendant's discriminatory and wrongful actions against Plaintiff as alleged, Plaintiff has suffered and will continue to suffer special damages that include, without limitation, loss of wages, salary, benefits, and/or additional amounts of money Plaintiff would have received but for Defendant's discriminatory and wrongful actions. Plaintiff continues to suffer the intangible loss of such employment-related opportunities as experience in the position Plaintiff held and advancement opportunities.

55.    As a direct, foreseeable, and proximate result of said wrongful acts and failures to act by Defendant, Plaintiff has suffered and will continue to suffer humiliation, shame, despair, embarrassment, depression, and mental pain and anguish, causing Plaintiff to incur damages in an amount to be proven at trial.

56.    Defendant committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice or despicable conduct. Alternatively, Defendant's wrongful conduct was carried out with a conscious disregard for Plaintiffs rights. Further, the alleged wrongful

conduct was carried out and ratified by a managing agent; or an officer, a director, or a managing agent and Defendant had advance knowledge of the unfitness of its decision-maker and employed them with a conscious disregard of Plaintiffs rights and/or authorized and/or ratified their conduct. As a result, Plaintiff is entitled to recover punitive and exemplary damages commensurate with Defendant's wrongful acts and sufficient to punish and deter future similarly reprehensible conduct. Plaintiff is entitled to recover prevailing party attorney's fees pursuant to Labor Code § 1102.5 G).

## FIFTH CAUSE OF ACTION

**Retaliation in Violation of FEHA [Cal. Govt. Code §§ 12940 et seq. and 12945.2(1)]**

**(Against Defendant and Does 1 through 20)**

57.    Plaintiff hereby incorporates by reference all the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

58.  California Government Code § 12940 (h) makes it unlawful for an employer to discharge, expel, or otherwise discriminate against any person, including adversely affecting working conditions, because the person has opposed any practices forbidden under Fair Employment & Housing Act.

59.  As alleged, on one or more occasions during their employment, Plaintiff engaged in protected activities, including but not limited to the following: Reporting, opposing, and/or objecting to suspected FEHA violations. Specifically, IVES was concerned and communicated to Alan Miller and Schoenfeld that the information shared by LEVO with third-party stakeholders was being materially misrepresented, and that the company could face compliance violations, government/regulatory investigation and administrative penalties due to improper capitalization, underfunding, and false promises made to the public about LEVO's capacity to lend.

60.  Plaintiff is informed, believes, and alleges that their engaging in the above-protected activities, and some combination of those factors, were the motivating reasons and/or factors in Defendants' decisions to subject Plaintiff to the adverse employment actions, including but not limited to their termination.

61.    Defendant violated FEHA by retaliating against Plaintiff and terminating Plaintiffs employment for attempting to exercise their protected rights, as set forth above.

**COMPLAINT FOR DAMAGES**

62.    As a direct, foreseeable, and proximate result of Defendant's conduct as alleged, Plaintiff has suffered and will continue to suffer actual damages, including lost earnings and other employment benefits, in a sum in excess of the jurisdictional limit of this Court, the exact amount of which is not yet known, which amount will be proven at trial.

63.    As a direct, foreseeable, and proximate result of Defendant's wrongful acts and failures to act, Plaintiff has suffered and will continue to suffer substantial emotional distress and will incur other incidental and consequential damages and losses, all in amounts to be proven at trial. Plaintiff claims all such amounts as damages, together with prejudgment interest, pursuant to any provision of law providing for prejudgment interest.

64.  As a direct, foreseeable, and proximate result of Defendant's discriminatory and wrongful actions against Plaintiff as alleged, Plaintiff has suffered and will continue to suffer special damages that include, without limitation, loss of wages, salary, benefits, and/or additional amounts of money Plaintiff would have received but for Defendant's discriminatory and wrongful actions. Plaintiff continues to suffer the intangible loss of such employment-related opportunities as experience in the position Plaintiff held and advancement opportunities.

65.    As a direct, foreseeable, and proximate result of said wrongful acts and failures to act by Defendant, Plaintiff has suffered and will continue to suffer humiliation, shame, despair, embarrassment, depression, and mental pain and anguish, causing Plaintiff to incur damages in an amount to be proven at trial.

66.    Defendant committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice or despicable conduct. Alternatively, Defendant's wrongful conduct was carried out with a conscious disregard for Plaintiffs rights. Further, the alleged wrongful conduct was carried out and ratified by a managing agent; or an officer, a director, or a managing agent and Defendant had advance knowledge of the unfitness of its decision-maker and employed them with a conscious disregard of Plaintiffs rights and/or authorized and/or ratified their conduct. As a result, Plaintiff is entitled to recover punitive and exemplary damages commensurate with Defendant's wrongful acts and sufficient to punish and deter future similarly reprehensible conduct.

67.     Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to the Fair Employment and Housing Act.

## SIXTH CAUSE OF ACTION

### Defamation - Slander

### (Against Defendant and Does 1 through 20)

68.     Plaintiff hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

69.     Defendants made material statements to third-parties, including employees, vendors, clients, business colleagues and others that Plaintiff was terminated "for good cause" arising from his performance of duties as CEO of LEVO.

70.     Defendants reasonably understood those statements about IVES were false.

71.     Defendants reasonably understood that the statements made about IVES would cause him to lose reputational standing in a business community which he had worked for over ten years; impede his ability to obtain gainful, alternate employment; cause humiliation and harm to his character; and, intimidate him into silence.

72.     Defendants failed to use reasonable care to determine the truth or falsity of the statements made prior to communicating to third-parties.

73.     As a direct, foreseeable, and proximate result of said wrongful acts and failures to act by Defendant, Plaintiff has suffered and will continue to suffer humiliation, shame, despair, embarrassment, depression, and mental pain and anguish, causing Plaintiff to incur damages in an amount to be proven at trial.

74.     Defendant committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice or despicable conduct. Alternatively, Defendant's wrongful conduct was carried out with a conscious disregard for Plaintiffs rights. Further, the alleged wrongful conduct was carried out and ratified by a managing agent; or an officer, a director, or a managing agent and Defendant had advance knowledge of the unfitness of its decision-maker and employed them with a conscious disregard of Plaintiffs rights and/or authorized and/or ratified their conduct.

**COMPLAINT FOR DAMAGES**

As a result, Plaintiff is entitled to recover punitive and exemplary damages commensurate with Defendant's wrongful acts and sufficient to punish and deter future similarly reprehensible conduct.

75.     Plaintiff is entitled to an award commensurate with the harm caused by Defendants' wrongful acts.

## SEVENTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### (Against Defendant and Does 1 through 20)

76.     Plaintiff hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

77.     During Plaintiffs employment with Defendant committed the herein referenced acts toward Plaintiff.

78.     Defendants' conduct towards Plaintiff, as described herein, was outrageous and extreme. Defendants' conduct was outrageous because it goes beyond all possible bo1mds of decency and because a reasonable person would regard the conduct as intolerable in a civilized community.

79.     Defendants. intended to cause Plaintiff severe emotional distress or acted with reckless disregard of the probability that Plaintiff would suffer emotional distress, knowing that Plaintiff was present when the conduct occurred.

80.     Defendants knew that emotional distress would probably result from Defendants' conduct, or Defendants gave little or no thought to the probable effects of their conduct.

81.     Defendants' conduct was a substantial motivating factor in causing Plaintiff's severe emotional distress.

82.     As a direct, foreseeable, and proximate result of Defendants' conduct as alleged, Plaintiff has suffered and will continue to suffer actual damages, including lost earnings and other employment benefits, in a sum in excess of the jurisdictional limit of this Court, the exact amount of which is not yet known, which amount will be proven at trial.

83.    As a direct, foreseeable, and proximate result of Defendants' wrongful acts and failures to act, Plaintiff has suffered and will continue to suffer substantial emotional distress and will incur other incidental and consequential damages and losses, all in amounts to be proven at trial. Plaintiff claims all such amounts as damages, together with prejudgment interest, pursuant to any provision of law providing for prejudgment interest.

84.    As a direct, foreseeable, and proximate result of Defendants' wrongful actions against Plaintiff as alleged, Plaintiff has suffered and will continue to suffer special damages that include, without limitation, loss of wages, salary, benefits, and/or additional amounts of money Plaintiff would have received but for Defendants' wrongful actions. Plaintiff continues to suffer the intangible loss of such employment-related opportunities as experience in the position Plaintiff held and advancement opportunities.

85.    As a direct, foreseeable, and proximate result of said wrongful acts and failures to act by Defendants, Plaintiff has suffered and will continue to suffer humiliation, shame, despair, embarrassment, depression, and mental pain and anguish, causing Plaintiff to incur damages in an amount to be proven at trial.

86.    Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, and with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice or despicable conduct. Alternatively, Defendants' wrongful conduct was carried out with a conscious disregard for Plaintiffs rights. Further, Defendants' wrongful conduct was carried out and ratified by a managing agent; or an officer, a director, or a managing agent who had advance knowledge of the unfitness of its decision-maker and employed them with a conscious disregard of Plaintiffs rights and/or authorized and/or ratified their conduct. As a result, Plaintiff is entitled to recover punitive and exemplary damages commensurate with Defendants' wrongful acts and sufficient to punish and deter future similarly reprehensible conduct.

## EIGHTH CAUSE OF ACTION

### Fraud In the Inducement

### (Against Defendant and Does 1 through 20)

97.    Plaintiff hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

16

**COMPLAINT FOR DAMAGES**

98.     The Defendants represented to IVES that they had the financing and financial wherewithal to fund LEVO, in an attempt to persuade IVES to accept the position of CEO, and to have him provide his knowledge, expertise and industry connections to the start-up business. Such representations on the financing and financial condition of the company were false representations of a material fact.

99.     At the time the promises were made to IVES between May and July 2023, the Defendants knew that the representations were false, or made the statements recklessly without knowledge of their truth and as a positive assertion

100.    The representations made by Defendants to IVES were made with the intent that the plaintiff would rely on them, inducing him to accept employment with LEVO, and provide his knowledge, expertise and industry connections for the benefit of the company.

101.    IVES actually and justifiably relied on the false representations made by Defendants, and each of them, in his decision to accept employment with LEVO as its CEO.

102.    As a direct, foreseeable, and proximate result of Defendants' conduct as alleged, Plaintiff has suffered and will continue to suffer actual damages, including lost earnings and other employment benefits, in a sum in excess of the jurisdictional limit of this Court, the exact amount of which is not yet known, which amount will be proven at trial.

103.    As a direct, foreseeable, and proximate result of Defendants' wrongful acts and failures to act, Plaintiff has suffered and will continue to suffer substantial emotional distress and will incur other incidental and consequential damages and losses, all in amounts to be proven at trial. Plaintiff claims all such amounts as damages, together with prejudgment interest, pursuant to any provision of law providing for prejudgment interest.

104.    As a direct, foreseeable, and proximate result of Defendants' wrongful actions against Plaintiff as alleged, Plaintiff has suffered and will continue to suffer special damages that include, without limitation, loss of wages, salary, benefits, and/or additional amounts of money Plaintiff would have received but for Defendants' wrongful actions. Plaintiff continues to suffer the intangible loss of such employment-related opportunities as experience in the position Plaintiff held and advancement opportunities.

**COMPLAINT FOR DAMAGES**

105.    As a direct, foreseeable, and proximate result of said wrongful acts and failures to act by Defendants, Plaintiff has suffered and will continue to suffer humiliation, shame, despair, embarrassment, depression, and mental pain and anguish, causing Plaintiff to incur damages in an amount to be proven at trial.

106.    Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, and with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice or despicable conduct. Further, Defendants' wrongful conduct was carried out and ratified by a managing agent; or an officer, a director, or a managing agent who had advance knowledge of the unfitness of its decision-maker and employed them with a conscious disregard of Plaintiffs rights and/or authorized and/or ratified their conduct. As a result, Plaintiff is entitled to recover punitive and exemplary damages commensurate with Defendants' wrongful acts and sufficient to punish and deter future similarly reprehensible conduct.

## NINTH CAUSE OF ACTION

### Fraud – False Promise

### (Against Defendant and Does 1 through 20)

107.    Plaintiff hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

108.    The Defendants represented to IVES that they had the financing and financial wherewithal to fund LEVO, in an attempt to persuade IVES to accept the position of CEO, and to have him provide his knowledge, expertise and industry connections to the start-up business. Such representations on the financing and financial condition of the company were false representations of a material fact.  Additionally, Defendants pledged that IVES would be gainfully employed by LEVO for a period of not less than three years, as reflected in the Employment Agreement, which is also a material fact.  Such promises were made knowing that Defendants had no intention to fulfill the promises made to IVES.

109.    At the time the promises were made to IVES between May and July 2023, the Defendants knew that the representations were false, or made the statements recklessly without knowledge of their truth and as a positive assertion

110.    The representations made by Defendants to IVES were made with the intent that the plaintiff would rely on them, inducing him to accept employment with LEVO, and provide his knowledge, expertise and industry connections for the benefit of the company, and denying other viable employment opportunities available at the time.

111.    IVES actually and justifiably relied on the false representations made by Defendants, and each of them, in his decision to accept employment with LEVO as its CEO. However, Defendants, and each of them, failed to perform on any of the material promises made to IVES, resulting in his termination of employment.

112.    As a direct, foreseeable, and proximate result of Defendants' conduct as alleged, Plaintiff has suffered and will continue to suffer actual damages, including lost earnings and other employment benefits, in a sum in excess of the jurisdictional limit of this Court, the exact amount of which is not yet known, which amount will be proven at trial.

113.    As a direct, foreseeable, and proximate result of Defendants' wrongful acts and failures to act, Plaintiff has suffered and will continue to suffer substantial emotional distress and will incur other incidental and consequential damages and losses, all in amounts to be proven at trial. Plaintiff claims all such amounts as damages, together with prejudgment interest, pursuant to any provision of law providing for prejudgment interest.

114.    As a direct, foreseeable, and proximate result of Defendants' wrongful actions against Plaintiff as alleged, Plaintiff has suffered and will continue to suffer special damages that include, without limitation, loss of wages, salary, benefits, and/or additional amounts of money Plaintiff would have received but for Defendants' wrongful actions. Plaintiff continues to suffer the intangible loss of such employment-related opportunities as experience in the position Plaintiff held and advancement opportunities.

115.    As a direct, foreseeable, and proximate result of said wrongful acts and failures to act by Defendants, Plaintiff has suffered and will continue to suffer humiliation, shame, despair, embarrassment, depression, and mental pain and anguish, causing Plaintiff to incur damages in an amount to be proven at trial.

116.    Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, and with the wrongful intention of injuring Plaintiff, and acted with an improper and

evil motive amounting to malice or despicable conduct. Further, Defendants' wrongful conduct was carried out and ratified by a managing agent; or an officer, a director, or a managing agent who had advance knowledge of the unfitness of its decision-maker and employed them with a conscious disregard of Plaintiffs rights and/or authorized and/or ratified their conduct. As a result, Plaintiff is entitled to recover punitive and exemplary damages commensurate with Defendants' wrongful acts and sufficient to punish and deter future similarly reprehensible conduct.

**TENTH CAUSE OF ACTION**

**Fraud – Intentional Misrepresentation**

**(Against Defendant and Does 1 through 20)**

117.    Plaintiff hereby incorporates by reference all the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

118.    The Defendants represented to IVES that they had the financing and financial wherewithal to fund LEVO, in an attempt to persuade IVES to accept the position of CEO, and to have him provide his knowledge, expertise and industry connections to the start-up business. Such representations on the financing and financial condition of the company were false representations of a material fact.  Additionally, Defendants pledged that IVES would be gainfully employed by LEVO for a period of not less than three years, as reflected in the Employment Agreement, which is also a material fact.  Such promises were made knowing that Defendants had no intention to fulfill the promises made to IVES.

119.    At the time the promises were made to IVES between May and July 2023, the Defendants knew that the representations were false, or made the statements recklessly without knowledge of their truth and as a positive assertion

120.    The representations made by Defendants to IVES were made with the intent that the plaintiff would rely on them, inducing him to accept employment with LEVO, and provide his knowledge, expertise and industry connections for the benefit of the company, and denying other viable employment opportunities available at the time.

121.    IVES actually and justifiably relied on the false representations made by Defendants, and each of them, in his decision to accept employment with LEVO as its CEO.

**COMPLAINT FOR DAMAGES**

However, Defendants, and each of them, failed to perform on any of the material promises made to IVES, resulting in his termination of employment.

122.    As a direct, foreseeable, and proximate result of Defendants' conduct as alleged, Plaintiff has suffered and will continue to suffer actual damages, including lost earnings and other employment benefits, in a sum in excess of the jurisdictional limit of this Court, the exact amount of which is not yet known, which amount will be proven at trial.

123.    As a direct, foreseeable, and proximate result of Defendants' wrongful acts and failures to act, Plaintiff has suffered and will continue to suffer substantial emotional distress and will incur other incidental and consequential damages and losses, all in amounts to be proven at trial. Plaintiff claims all such amounts as damages, together with prejudgment interest, pursuant to any provision of law providing for prejudgment interest.

124.    As a direct, foreseeable, and proximate result of Defendants' wrongful actions against Plaintiff as alleged, Plaintiff has suffered and will continue to suffer special damages that include, without limitation, loss of wages, salary, benefits, and/or additional amounts of money Plaintiff would have received but for Defendants' wrongful actions. Plaintiff continues to suffer the intangible loss of such employment-related opportunities as experience in the position Plaintiff held and advancement opportunities.

125.    As a direct, foreseeable, and proximate result of said wrongful acts and failures to act by Defendants, Plaintiff has suffered and will continue to suffer humiliation, shame, despair, embarrassment, depression, and mental pain and anguish, causing Plaintiff to incur damages in an amount to be proven at trial.

126.    Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, and with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice or despicable conduct. Further, Defendants' wrongful conduct was carried out and ratified by a managing agent; or an officer, a director, or a managing agent who had advance knowledge of the unfitness of its decision-maker and employed them with a conscious disregard of Plaintiffs rights and/or authorized and/or ratified their conduct. As a result, Plaintiff is entitled to recover punitive and exemplary damages commensurate with Defendants' wrongful acts and sufficient to punish and deter future similarly reprehensible conduct.

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as set forth below:

**ON THE FIRST CAUSE OF ACTION**:

       a.  For general damages, according to proof;

       b.  For special damages, according to proof;

       c.  For compensatory and consequential damages, according to proof;

       d.  For costs of suit incurred in this action; and

       e.  For such other and further relief as the Court deems proper and just.

**ON THE SECOND CAUSE OF ACTION:**

       a.  For general damages, according to proof;

       b.  For special damages, according to proof;

       c.  For compensatory and consequential damages, according to proof;

       d.  For costs of suit incurred in this action; and

       e.  For such other and further relief as the Court deems proper and just.

**ON THE THIRD CAUSE OF ACTION**:

       a.  For general damages, according to proof;

       b.  For special damages, according to proof;

       c.  For compensatory and consequential damages, according to proof;

       d.  For punitive damages according to proof;

       e.  For reasonable attorney's fees incurred in this action;

       f.  For costs of suit incurred in this action; and

       g.  For such other and further relief as the Court deems proper and just.

**COMPLAINT FOR DAMAGES**

**ON THE FOURTH CAUSE OF ACTION:**

     a.  For general damages, according to proof;

     b.  For special damages, according to proof;

     c.  For compensatory and consequential damages, according to proof;

     d.  For punitive damages according to proof;

     e.  For reasonable attorney's fees incurred in this action;

     f.  For costs of suit incurred in this action; and

     g.  For such other and further relief as the Court deems proper and just.

**ON THE FIFTH CAUSE OF ACTION:**

     a.  For general damages, according to proof;

     b.  For special damages, according to proof;

     c.  For compensatory and consequential damages, according to proof;

     d.  For punitive damages according to proof;

     e.  For reasonable attorney's fees incurred in this action;

     f.  For costs of suit incurred in this action; and

     g.  For such other and further relief as the Court deems proper and just.

**ON THE SIXTH CAUSE OF ACTION:**

     a.  For general damages, according to proof;

     b.  For special damages, according to proof;

     c.  For compensatory and consequential damages, according to proof;

     d.  For punitive damages according to proof;

     e.  For such other and further relief as the Court deems proper and just.

23

**COMPLAINT FOR DAMAGES**

**ON THE SEVENTH CAUSE OF ACTION:**

        a.   For general damages, according to proof;

        b.   For special damages, according to proof;

        c.   For compensatory and consequential damages, according to proof;

        d.   For punitive damages according to proof;

        e.   For such other and further relief as the Court deems proper and just.

**ON THE EIGHTH CAUSE OF ACTION:**

        a.   For general damages, according to proof;

        b.   For special damages, according to proof;

        c.   For compensatory and consequential damages, according to proof;

        d.   For punitive damages according to proof;

**ON THE NINTH CAUSE OF ACTION:**

        a.   For general damages, according to proof;

        b.   For special damages, according to proof;

        c.   For compensatory and consequential damages, according to proof;

        d.   For punitive damages according to proof;

/ / /

/ / /

/ / /

/ / /

/ / /

**COMPLAINT FOR DAMAGES**

**ON THE TENTH CAUSE OF ACTION:**

      a.  For general damages, according to proof;

      b.  For special damages, according to proof;

      c.  For compensatory and consequential damages, according to proof;

      d.  For punitive damages according to proof;

<u>**DEMAND FOR TRIAL BY JURY**</u>

    Plaintiff hereby demands trial by jury of all causes of action.

Dated: September 10, 2024

                            Respectfully submitted,
                            KOEGLE LAW GROUP, APC

                            _____
                            Brian E. Koegle, Esq.
                            Lucas E. Rowe, Esq.
                            Ransom D. Boynton, Esq.
                            Attorneys for Plaintiff, Christopher Ives

**COMPLAINT FOR DAMAGES**

# EXHIBIT A

# EMPLOYMENT AGREEMENT

This Employment Agreement ("***Agreement***"), dated July 17, 2023 (the "***Commencement Date***"), is made by and between Christopher Ives ("***Executive***") and Levo Funding, Inc. (the "***Company***," and together with Executive, the "***Parties***").

WHEREAS, the Company desires to employ Executive, and Executive desires to be employed by the Company, on the terms and conditions set forth in this Agreement; and

WHEREAS, Executive acknowledges that (i) Executive's employment with the Company will provide Executive with trade secrets of, and confidential information concerning, the Company and its subsidiaries and affiliates (collectively, the "***Company Group***"), and (ii) the covenants contained in this Agreement are essential to protect the business and goodwill of the Company Group.

NOW, THEREFORE, in consideration of the promises and the respective covenants and agreements of the Parties set forth below, and intending to be legally bound hereby, the Parties agree as follows:

1. <u>Position and Duties</u>.

1.1.    Executive shall be employed on a full-time basis as Chief Executive Officer of the Company. He will report directly to the Board of Directors of the Company (the "***Board***"). He will at all times, faithfully, industriously and to the best of his ability, perform all duties that may be required of him by virtue of his position as Chief Executive Officer of the Company, and he will abide by all duties set forth in the Company's Bylaws and in policy statements issued by the Board. He is hereby vested with authority to act on behalf of the Board in keeping with policies adopted by the Board, as amended from time to time. In addition, he shall perform in the same manner any special duties assigned or delegated to him by the Board. During the Employment Term, Executive shall devote his full business time and attention to the faithful performance of his duties to the Company Group. Executive shall comply with the Company's policies and procedures in all material respects.

1.2.    Notwithstanding the foregoing, nothing contained in this <u>Section 1</u> shall prevent or limit Executive's right to manage Executive's personal investments on Executive's own personal time, including the right to make passive investments in the securities of any publicly held entity so long as Executive's aggregate direct and indirect interest does not exceed five percent (5%) of the issued and outstanding securities of any class of securities of such publicly held entity and so long as such activities do not materially interfere with Executive's duties for the Company.

2. <u>Term of Employment</u>. The employment of Executive under this Agreement shall be for a three (3) year term commencing on the date hereof (the "***Term***"), unless terminated earlier in accordance with the provisions of <u>Section 4</u> of this Agreement. This Agreement shall automatically renew for successive one (1) year terms (each a "***Renewal Term***") unless either party notifies the other in writing, at least sixty (60) days prior to the expiration of the Term or any subsequent Renewal Term then in effect, that this Agreement shall not renew, or unless terminated earlier in accordance with <u>Section 4</u> (the Term and any successive Renewal Terms collectively, the "***Employment Term***"). Upon Executive's termination of employment with the Company for any reason, Executive's other positions within the Company Group, if any, shall terminate

automatically, Executive shall automatically cease to be an officer, director and manager of each member of the Company Group, and Executive shall promptly execute any reasonable or necessary documents to effectuate the same.

3.  Compensation and Benefits.

3.1.    Initial Ninety (90) Day Salary. Executive's total compensation for the initial ninety (90) day period, from July 17, 2023 to October 15, 2023, shall be Sixty Two Thousand Five Hundred Dollars ($62,500.00)(less applicable withholdings and deductions) and shall be payable by the Company in regular co-equal installments in accordance with the Company's general payroll practices in effect from time to time. Executive's position is exempt and Executive will not be eligible for overtime pay.

3.2.    Base Salary. Executive's first year base salary starting on October 16, 2023shall be Three Hundred Fifty Thousand Dollars ($350,000.00) per annum (less applicable withholdings and deductions). Executive may be entitled to merit increases in his base salary as the Board may determine, in its sole discretion, from time to time (as adjusted from time to time, the "***Base Salary***"). The Board may not decrease Executive's Base Salary at any time. Executive's Base Salary shall be payable by the Company in regular co-equal installments in accordance with the Company's general payroll practices in effect from time to time. Executive's position is exempt and Executive will not be eligible for overtime pay.

3.3.    Bonus Compensation. In addition to the Base Salary, Executive may be entitled to additional, variable compensation (the "***Bonus Compensation***"), with a target equal to forty five percent (45%) of Executive's Base Salary for the applicable year (the "***Target Bonus***"). Bonus Compensation shall be paid each calendar year during the Employment Term subject to Executive's continued employment through January 1 following the calendar year in respect of which such bonus is earned (the "***Bonus Year***"). Executive's annual Bonus Compensation shall be calculated based on and shall be paid if Executive meets or achieves established qualitative and quantitative performance targets and objectives reasonably determined by the Board. The Bonus Compensation shall be paid, if earned, in one lump sum cash payment within fifteen (15) days after the Company's completion of its fiscal year audit for the period to which such Bonus Compensation relates, but in no event later than June 30 of the year following the Bonus Year.

3.4.    Other Benefits. Executive shall be eligible to participate in all of the Company's employee benefit programs generally available to similarly-situated senior executive employees of the Company Group, as they may be in effect from time to time at the Company, subject to the terms and conditions of the relevant plan documents. The Company reserves the right to modify, suspend, or discontinue any and all such plans at any time without recourse by Executive. During the Employment Term, Executive shall be entitled to paid vacation and holidays in accordance with the Company's policies as in effect from time to time.

3.5.    Location; Expenses. Executive shall be permitted to work and provide services in locations that Executive and the Board agree upon; provided, however, that Executive shall be expected to travel as necessary in connection with the fulfillment of Executive's duties hereunder. The Company shall reimburse Executive for all reasonable, ordinary, and necessary documented travel (other than commuting costs to Executive's primary office location), entertainment, and other out-of-pocket expenses that Executive incurs on behalf of the Company in the course of

2

performing his duties hereunder, in accordance with the Company's normal policies and provisions regarding such reimbursements as in effect from time to time.

4.   <u>Termination</u>.

4.1.   <u>Termination</u>. Executive's employment under this Agreement shall continue until terminated pursuant to this <u>Section 4</u>.

(a)   <u>By the Company for Cause.</u>   At any time during the Employment Term the Company may immediately terminate the Employment Term and Executive's employment hereunder for Cause (as defined below) upon written notice by the Company to Executive. For the purposes of this <u>Section 4.1(a)</u>, the term "***Cause***" shall be defined as follows:

(i)   Executive's material breach of the terms of, or Executive's obligations under, this Agreement or a breach of any covenants by which Executive may be bound, including but not limited to those set forth in Section 6 below;

(ii)   Executive's gross negligence in the performance or intentional non-performance of Executive's duties to the Company Group, which, if curable, Executive fails to cure within thirty (30) days after receipt of a written notice from the Company setting forth with reasonable particularity the gross negligence or intentional non-performance;

(iii)   Executive's violation of the Company's, or, to the extent applicable to Executive, any member of the Company Group's code of conduct or other compliance policies (including, but not limited to, policies prohibiting sexual harassment, discrimination, substance abuse, workplace violence, or threatened violence);

(iv)   without limiting the preceding clause (C), Executive's material breach of the Company's or, to the extent applicable to Executive, any member of the Company Group's, written policies or procedures;

(v)   Executive's conviction of or Executive's pleading guilty or nolo contendere to a felony or a crime of moral turpitude;

(vi)   Executive's commission of an act involving theft, willful and material misrepresentation, deceit, dishonesty, fraud, perjury or embezzlement, or other misleading or unlawful conduct with regard to the Company in connection with Executive's duties;

(vii)   Executive's repeated absence from work without a reasonable excuse (after receiving reasonable notice);

(viii)   Executive's refusal to follow the reasonable directions of the Board, which refusal has not been cured within thirty (30) days after Executive has received a written notice from the Company setting

3

forth the way in which Executive has not followed the reasonable directions of the Board;

(ix)    Executive's misconduct unrelated to the Company having, or likely to have, a material negative impact on the Company or any member of the Company Group (economically or reputationally);

(x)    Executive's material breach of Executive's fiduciary duties as an executive, officer, trustee, or director of the Company, insider dealings, and/or usurpation of corporate opportunities belonging to the Company; or

(xi)    Executive using, distributing or being under the influence of drugs or other banned or illegal substances (other than prescription medicine to the extent such medicine is taken in accordance with its directions or under the supervision of a physician or over-the-counter medication when used in accordance with the label for such medication).

(b)    <u>Death or Disability</u>. Executive's employment shall automatically terminate immediately upon the death of Executive. In the event that Executive suffers a Disability during his employment and is unable to continue to perform substantially all of Executive's duties and responsibilities under this Agreement, either with or without reasonable accommodation, the Company will continue to pay Executive's Base Salary and to provide Executive benefits in accordance with <u>Section 3.3</u> above, to the extent permitted by plan terms, for up to twelve (12) weeks during any period of Disability within three hundred sixty-five (365) consecutive calendar days.  If Executive is unable to return to work with or without a reasonable accommodation after such twelve (12) week period, the Company may terminate Executive's employment, upon notice to Executive.  As used herein, the term "Disability" shall mean the inability of Executive, due to a physical or mental illness, injury, accident, or condition, to perform the essential functions of her position, with or without reasonable accommodation, for a period of ninety (90) days during any period of one hundred eighty (180) consecutive calendar days. A determination of Disability shall be made by a physician satisfactory to both Executive and the Company, provided, that if Executive and the Company do not agree on a physician, Executive and the Company shall each select a physician, which two physicians shall together select a third physician, whose determination as to disability shall be binding on all Parties.

(c)    <u>Non-Renewal</u>.  Upon not less than sixty (60) days' written notice prior to the expiration of the Term or any Renewal Term, as applicable, at the election of either Party not to enter into a or another Renewal Term, pursuant to <u>Section 2</u>.

(d)    <u>By the Company without Cause or By the Executive Voluntarily</u>.  At any time during the Employment Term, following not less than sixty (60)  days' prior written notice, the Company may terminate the Employment Term and Executive's employment hereunder without Cause (that is, other than for reasons constituting Cause, or as a result of Executive's death or Disability,  or upon election not to enter into a Renewal Term, in accordance with <u>Sections 4.1(a)</u>, <u>4.1(b)</u> or <u>4.1(c)</u>, respectively) or the Executive may terminate the Employment Term voluntarily at any time.

4

4.2. <u>Effect of Termination</u>.

(a)    <u>Termination by the Company for Cause; by Executive Voluntarily; or upon Non-Renewal</u>. In the event Executive's employment is terminated by the Company for Cause pursuant to <u>Section 4.1(a)</u>, or by the Executive voluntarily pursuant to <u>Section 4.1(d)</u>, or by the Company or Executive upon notice of non-renewal pursuant to <u>Section 4.1(c)</u>, the Company shall pay to Executive his Base Salary through the last day of his actual employment by the Company, any accrued and unused vacation, and any unreimbursed business expenses in accordance with the Company's expense reimbursement policy (the "***Accrued Obligations***"). Executive shall not accrue any additional compensation (including Base Salary or Bonus) or other benefits under this Agreement following such termination from employment, unless as otherwise provided under the applicable benefit plan or arrangement, or under applicable law. All other benefits, if any, due to Executive following Executive's termination of employment pursuant to this <u>Section 4.2(a)</u> shall be determined in accordance with the plans, policies, and practices of the Company; <u>provided</u>, that Executive shall not participate in any severance plan, policy, or program of the Company that would result in a duplication of benefits.

(b)    <u>Termination for Death or Disability</u>. If Executive's employment is terminated by death or due to Executive's Disability, pursuant to <u>Section 4.1(b)</u>, Executive or his estate shall be entitled to receive the Accrued Obligations. All other benefits, if any, due to Executive or Executive's estate following Executive's termination due to Executive's death or Disability shall be determined in accordance with the plans, policies, and practices of the Company; <u>provided</u>, that Executive (or his estate) shall not participate in any severance plan, policy, or program of the Company that would result in a duplication of benefits. Executive or his estate shall not accrue any additional compensation (including Base Salary or Bonus) or other benefits under this Agreement following such termination of employment, except for any benefits to which Executive (or his estate) is entitled pursuant to the terms of the employee benefit plans of the Company in which Executive is participating immediately prior to such termination.

(c)    <u>Termination at the Election of the Company</u>. In the event Executive's employment is terminated at the election of the Company without Cause pursuant to <u>Section 4.1(d)</u>, the Company shall pay to Executive (i) the Accrued Obligations, and (ii) provided that Executive executes and does not revoke a valid waiver and release of all claims that Executive may have against the Company Group in a form and of a substance to be provided by the Company (which waiver and release of all claims shall contain appropriate carve-outs for amounts payable pursuant to this Agreement and any rights Executive may have under any benefit plans or programs of the Company Group), Executive's Base Salary for a period of twelve (12) months, minus applicable deductions and withholdings, and payable in regular co-equal installments in accordance with the Company's regular payroll practices, with the first installment to be paid on the Company's first regularly scheduled payroll date that is at least fourteen (14) days after the effective date of the waiver and release of claims.  All other benefits, if any, due to Executive following a termination pursuant to <u>Section 4.1(d)</u> shall be determined in accordance with the plans, policies, and practices of the Company; <u>provided</u>, that Executive shall not participate in any severance plan, policy, or program of the Company to the extent such participation will result in a duplication of benefits. Other than as provided in this <u>Section 4.2(c)</u>, Executive shall not accrue any additional compensation (including any Base Salary or Bonus Compensation) or other benefits under this Agreement following such termination from employment.

CONFIDENTIAL                                    LEVO 000006

5.   <u>Company Policies and Procedures</u>. Executive shall comply with all Company policies and procedures ("***Policies and Procedures***") as the same may be adopted, amended, or promulgated by the Company from time to time. To the extent of any conflict between the terms of this Agreement and the Policies and Procedures, this Agreement shall control.

6.   <u>Executive's Obligations</u>.

6.1.    <u>Confidential Information</u>. Executive acknowledges that the Company Group has a legitimate and continuing proprietary interest in the protection of its confidential information and that it has invested substantial sums and will continue to invest substantial sums to develop, maintain, and protect such confidential information. During the Employment Term and at all times thereafter, Executive shall not, except with the written consent of the Company or in connection with carrying out Executive's duties or responsibilities hereunder, furnish or make accessible to any third party or use for Executive's own benefit any trade secrets, or confidential or proprietary information of the Company Group, whether maintained in digital form or hardcopy, including financial data, investment data, commercial data, all personal information, personnel information, trade secrets, business plans, business models, organizational structures and models, business strategies (including but not limited to trading and recruiting strategies), formulas, algorithms, marketing plans, information and materials, processes, inventions, devices, training manuals, computer programs, databases, investor lists (including, without limitation, any information regarding the Company Group's current or prospective clients, customers, or investors), analytical models, investment and economic research and analysis, investment proposals, templates and agreements, and all other proprietary or confidential information concerning or provided by or on behalf of the Company Group, including, without limitation, information regarding any actual or prospective business opportunities, employment opportunities, finances, and investments (hereafter referred to as "***Confidential Information***"); <u>provided</u>, that such Confidential Information shall not include information that, at the time of disclosure or use, was generally available to the public other than by a breach of this Agreement. Executive agrees that any materials developed by him in connection with his employment by the Company shall be the property of the Company, and the Company will solely retain and own all rights in such materials. Nothing in this Agreement limits, restricts or in any other way affects Executive's communicating with any governmental agency or entity, or communicating with any official or staff person of a governmental agency or entity, concerning matters relevant to the governmental agency or entity. Notwithstanding anything herein to the contrary, in accordance with the Defend Trade Secrets Act, 18 U.S.C. § 1833(b), and other applicable law, nothing in this Agreement or any other agreement or policy shall prohibit Executive from, or expose Executive to criminal or civil liability under federal or state trade secret law for: (A) filing a charge or complaint with, communicating with, participating in any investigation or proceeding that may be conducted by or otherwise directly or indirectly sharing any Company Group member's trade secrets or other Confidential Information (except information protected by any Company Group member's attorney-client or work product privilege) with law enforcement, an attorney, or any federal, state or local government agencies, regulators or officials (including the Equal Employment Opportunity Commission, the Securities and Exchange Commission and equivalent state and local agencies), for the purposes of investigating or reporting a suspected violation of law, whether in response to a subpoena or otherwise, without notice to the Company Group, or (B) disclosing trade secrets in a complaint or other document filed in connection with a legal claim, or to Executive's attorney for use in a whistleblower retaliation lawsuit, provided that any filing is made under seal. Further, nothing herein shall prevent Executive from participating in any action seeking to rectify or address

6

harassment, sexual harassment, or discrimination, from making good faith based allegations relating to the same, or from discussing or disclosing information related to Executive's general job duties or responsibilities and/or regarding employee wages or benefits.

6.2.    <u>Property of the Company</u>. Executive acknowledges and agrees that "***Company Property***" shall mean all property and resources of the Company Group, including, without limitation, Confidential Information, memoranda, notes, lists, records and other documents or papers (and all copies thereof), the Company Group's products, computer systems and all software, e-mail, web pages and databases, telephone and facsimile services, and all other administrative and/or support services provided by the Company Group.

6.3.    <u>Nondisparagement</u>. Except as provided in Section 6.1 above, as within the performance of Executive's lawful and authorized duties within the scope of Executive's employment, or as otherwise approved in writing by the Board, Executive agrees that, during the Employment Term and at all times thereafter, Executive will not, whether in private or in public, whether orally, in writing or otherwise, whether directly or indirectly (i) make or publish negative or disparaging remarks that in any way relate to any member of the Company Group, or any of their respective officers, directors, employees, or agents; (ii) comment upon or discuss any member of the Company Group, or their respective officers, directors, employees and agents, with any media source, including but not limited to any reporters, television, radio, movie, theatrical, internet web blog or web site, social media, national or local newspaper, magazine, or any other news organization, news outlet, or publication; (iii) publish, or draft for publication, any written material whatsoever related to any member of the Company Group or their respective officers, directors, employees and agents; or (iv) aid, assist or direct any other person or entity to do any of the foregoing. Notwithstanding the foregoing, nothing herein shall prevent either Executive from testifying truthfully in any legal or administrative proceeding where such testimony is compelled or requested, or from otherwise complying with applicable legal requirements.

6.4.    <u>Legal Process</u>. Except as provided in Section 6.1 above, if Executive receives a subpoena or process from any person or entity (including, but not limited to, any governmental agency) that would or may require Executive to disclose documents or information or provide testimony (in a deposition, court proceeding, or otherwise) regarding, in whole or in part, the Company Group or any Confidential Information or Company Property, Executive shall: (a) notify the Company of the subpoena or other process as promptly as practicable, so long as Executive has the legal right to provide such notice; and (b) to the maximum extent possible, not make any disclosure until the Company Group has had a reasonable opportunity to contest the right of the requesting person or entity to such disclosure, limit the scope or nature of such disclosure, and/or seek to participate in the proceeding or matter in which the disclosure is sought.

6.5.    <u>Cooperation and Assistance</u>. Executive agrees that during the Emplyment Term and thereafter, he shall, upon reasonable notice, furnish such information and proper assistance to the Company Group as it may reasonably request in connection with any existing or future investigation by or legal action(s) involving the Company Group, whether administrative, civil, or criminal in nature, in which and to the extent the Company Group reasonably deems Executive's cooperation necessary, without further compensation; <u>provided</u>, <u>however</u>, that Executive's cooperation shall be subject to reasonable accommodation to Executive's schedule and, if this cooperation requires Executive to incur expenses for travel and lodging, such expenses will be reimbursed as long as those expenses are reasonable and approved by the Company in advance.

CONFIDENTIAL                                                                                          LEVO 000008

6.6.    Enforcement. Executive acknowledges and agrees that the foregoing provisions and restrictions contained in this Section 6 are reasonable and necessary for the protection of the Company Group and their businesses. These obligations are not limited in time to the duration of Executive's employment and rather shall survive the termination of Executive's employment, irrespective of the reason for its termination. Executive agrees that his breach of any of the foregoing provisions will result in irreparable injury to the Company Group, that monetary relief alone will be inadequate to redress such a breach, and further that the Company Group shall be entitled to seek an injunction to prevent and/or remedy such a breach or threatened breach (without first having to post a bond or other security). In any proceeding for an injunction and upon any motion for a temporary or permanent injunction ("*Injunctive Action*"), the Company Group's right to receive monetary damages shall not be a bar or interposed as a defense to the granting of such injunction. The Company Group's right to seek an injunction is in addition to, and not in lieu of, any other rights and remedies available to the Company Group under law or in equity. Any Injunctive Action may be brought in any appropriate court located in the State of California or, if federal jurisdiction is appropriate, in the United States federal court located in the State of California. Executive hereby irrevocably submits to the jurisdiction of such courts in any Injunctive Action and waives any claim or defense of inconvenient or improper forum or lack of personal jurisdiction under any applicable law or decision. Upon the issuance (or denial) of an injunction, the underlying merits of any dispute will be resolved in accordance with the arbitration provisions of Section 7 of this Agreement.

7.    Arbitration.

7.1.    The Parties irrevocably and unconditionally agree that any past, present, or future dispute, controversy, or claim arising under or relating to this Agreement, arising under any federal, state, or local statute, regulation, law, ordinance, or the common law (including but not limited to any law prohibiting discrimination), and/or under any other confidentiality or non-disclosure agreement, and/or in connection with Executive's employment, or termination thereof, involving Executive on the one hand and the Company, any other member of the Company Group, or any of its or their respective officers, directors, employees or agents on the other hand, including both claims brought by Executive and claims brought against Executive, shall be submitted to binding arbitration as provided herein. Any arbitration pursuant to this Agreement shall be administered by the American Arbitration Association ("*AAA*"); shall be conducted in accordance with the AAA Arbitration Rules for Employment Disputes, as modified herein; and shall be conducted by a single arbitrator, who shall have experience in employment disputes. Such arbitration shall be conducted in the State of California, and the arbitrator will apply California law, including federal law as applied in California courts. The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, and/or formation of this Agreement, including but not limited to any dispute as to whether (i) a particular claim is subject to arbitration hereunder and/or (ii) any part of this Section 7 is void or voidable. The arbitral award shall be in writing, state the reasons for the award, and be final and binding on the Parties. The arbitration shall be conducted on a strictly confidential basis, and no Party, arbitrator, or other person or entity shall disclose the existence of a claim, the nature of a claim, any documents, correspondence, pleadings, briefing, exhibits, or information exchanged or presented in connection with such a claim, or any rulings, decisions, or results of any claim or argument (collectively, "*Arbitration Materials*"), to any third party, with the sole exception of the Parties' legal counsel, who also shall be bound by these confidentiality terms. In the event either Party substantially prevails in an action involving a breach

8

of any provision of Section 6, such Party shall be entitled to an award including its reasonable attorneys' fees and costs, to the extent such an award is permitted by law.

7.2.    In the event of any court proceeding to challenge or enforce an arbitrator's award, the Parties hereby consent to the exclusive jurisdiction of the state and federal courts sitting in California; agree to exclusive venue in that jurisdiction; and waive any claim that such jurisdiction is an inconvenient forum. There shall be no interlocutory appeals to any court, or any motions to vacate any order of the arbitrator that is not a final award dispositive of the arbitration in its entirety, except as required by law. The Parties agree to take all steps necessary to protect the confidentiality of the Arbitration Materials in connection with any court proceeding, agree to use their best efforts to file all Confidential Information (and documents containing Confidential Information) under seal, and agree to the entry of an appropriate protective order encompassing the confidentiality terms of this Agreement.

8.    Miscellaneous.

8.1.    Executive's Representations. Executive hereby represents and warrants to the Company that (i) Executive has read this Agreement in its entirety, fully understands the terms of this Agreement, has had the opportunity to consult with counsel prior to executing this Agreement, and is signing the Agreement voluntarily and with full knowledge of its significance; (ii) the execution, delivery, and performance of this Agreement by Executive does not and shall not conflict with, breach, violate, or cause a default under any contract, agreement, instrument, order, judgment, or decree to which Executive is a party or by which he is bound; (iii) Executive is not a party to or bound by an employment agreement, non-compete agreement, or confidentiality agreement with any other person or entity which would be breached by entering into this Agreement or interfere in any material respect with the performance of her duties hereunder; and (iv) Executive has not engaged in any conduct (or aided or assisted any other person or entity to engage in any conduct or cover-up of such conduct), whether within the scope of Executive's employment at a previous employer or otherwise, that could cause any damage to the Company's or any of its subsidiaries' or affiliates' reputation or business or the Company's or any of its subsidiaries' or affiliates' employees, including, but not limited to, any conduct constituting sexual misconduct, sexual harassment, harassment or discrimination; and (v) Executive shall not use any confidential information or trade secrets of any person or party other than the Company Group in connection with the performance of her duties hereunder. Executive agrees to immediately notify the Board, in writing, if any representation in this Section 8.1 is or becomes untrue or inaccurate at any time.

8.2.    Waiver. No provision of this Agreement may be modified, waived, or discharged unless such waiver, modification, or discharge is agreed to in a writing signed by Executive and an executive officer of the Company (other than Executive). No waiver by either Party at any time of any breach of the other Party of, or compliance with, any condition or provision of this Agreement to be performed by such other Party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

8.3.    Successors and Assigns. Executive may not assign his rights or interests under this Agreement. This Agreement may be assigned by the Company to an affiliated entity or to any successor assignee of the Company with or without Executive's consent, and shall be binding on and inure to the benefit of the successors and assigns of the Company.

CONFIDENTIAL                                                                                                      LEVO 000010

8.4.    <u>Governing Law</u>. The provisions of this Agreement shall be governed by and construed and enforced in accordance with the internal, substantive laws of the State of California, including federal law as applied in California courts, without regard to the principles of conflicts of laws thereof.

8.5.    <u>Complete Agreement; Survival</u>. This Agreement embodies the complete agreement and understanding between Executive and the Company and supersedes and preempts any prior understandings, agreements, or representations by or between the Parties, written or oral, which may have related to the subject matter hereof in any way. If any term or provision of this Agreement (or any portion thereof) is determined by an arbitrator or court of competent jurisdiction to be invalid, illegal, or incapable of being enforced, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect. Upon a determination that any term or provision (or any portion thereof) is invalid, illegal, or incapable of being enforced, the Parties agree that an arbitrator reviewing court shall have the authority to "blue pencil" or modify this agreement so as to render it enforceable and effect the original intent of the Parties to the fullest extent permitted by applicable law. The provisions set forth in <u>Sections 6</u> and <u>7</u> of this Agreement shall survive the termination of Executive's employment for any reason.

8.6.    <u>Advice of Counsel and Construction</u>. Each Party acknowledges that such Party had the opportunity to be represented by counsel in the negotiation and execution of this Agreement. Accordingly, the rule of construction of contract language against the drafting party is hereby waived by each Party.

8.7.    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

8.8.    <u>Notices</u>**.** Any notices provided for in this Agreement shall be in writing and shall be effective when delivered in person or deposited in the United States mail, postage prepaid, and addressed to the Executive at his last known address on the books of the Company or, in the case of the Company, to it at its principal place of business, attention of the Chairman of the Board, or to such other address as either party may specify by notice to the other actually received.

8.9.    <u>Section 409A</u>. Notwithstanding anything herein to the contrary, this Agreement is intended to be interpreted and applied so that the payment of the benefits set forth herein either shall  be exempt from the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "**_Code_**"), or shall comply with the requirements of such provision. Notwithstanding anything in this Agreement or elsewhere to the contrary, distributions upon termination of Executive's employment may only be made upon a "separation from service" as determined under Section 409A of the Code. Each payment under this Agreement or otherwise shall be treated as a separate payment for purposes of Section 409A of the Code. In no event may Executive, directly or indirectly, designate the calendar year of any payment to be made under this Agreement or otherwise which constitutes a "deferral of compensation" within the meaning of Section 409A of the Code. All reimbursements and in-kind benefits provided under this Agreement shall be made or provided in accordance with the requirements of Section 409A of the Code. To the extent that any reimbursements pursuant to this Agreement or otherwise are taxable to Executive, any reimbursement payment due to Executive shall be paid to Executive on or before the last day of Executive's taxable year following the taxable year in which the related expense was incurred;

10

provided that, Executive has provided the Company written documentation of such expenses in a timely fashion and such expenses otherwise satisfy the Company's expense reimbursement policies. Reimbursements pursuant to this Agreement or otherwise are not subject to liquidation or exchange for another benefit and the amount of such reimbursements that Executive receives in one taxable year shall not affect the amount of such reimbursements that Executive receives in any other taxable year. To the extent that the Company determines that any provision of this Agreement would cause the Executive to incur any additional tax or interest under Code Section 409A, the Company shall be entitled to reform such provision in consultation with Executive's counsel to attempt to comply with or be exempt from Code Section 409A through good faith modifications. To the extent that any provision hereof is modified in order to comply with Code Section 409A, such modification shall be made in good faith and shall, to the maximum extent reasonably possible, maintain the original intent and economic benefit to Executive and the Company without violating the provisions of Code Section 409A.  Notwithstanding any of the foregoing to the contrary, the Company and its respective officers, directors, employees, or agents make no guarantee that the terms of this Agreement as written comply with, or are exempt from, the provisions of Code Section 409A, and none of the foregoing shall have any liability for the failure of the terms of this Agreement as written to comply with, or be exempt form, the provisions of Code Section 409A.

[*Signature Page Follows*]

CONFIDENTIAL                                                                LEVO 000012

IN WITNESS WHEREOF, the Parties have acknowledged the acceptance of the terms of this Agreement as of the date first set forth above:

LEVO FUNDING, INC.

By: _____

Name: Alan Miller

Title: President

EXECUTIVE

Christopher Ives

Christopher Ives

[Signature Page to Employment Agreement]

# EXHIBIT B

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR
KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

September 9, 2024

Brian Koegle
27240 Turnberry Lane, Suite 200
Valencia, CA 91355

RE:    **Notice to Complainant's Attorney**
CRD Matter Number: 202409-26125309
Right to Sue: Ives / Levo Funding, Inc.

Dear Brian Koegle:

Attached is a copy of your complaint of discrimination filed with the Civil Rights Department (CRD) pursuant to the California Fair Employment and Housing Act, Government Code section 12900 et seq. Also attached is a copy of your Notice of Case Closure and Right to Sue.

**Pursuant to Government Code section 12962, CRD will not serve these documents on the employer.** You must serve the complaint separately, to all named respondents. Please refer to the attached Notice of Case Closure and Right to Sue for information regarding filing a private lawsuit in the State of California. A courtesy "Notice of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the CRD does not review or edit the complaint form to ensure that it meets procedural or statutory requirements.

Sincerely,

Civil Rights Department

CRD - ENF 80 RS (Revised 2024/05)

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

September 9, 2024

RE:     **Notice of Filing of Discrimination Complaint**
        CRD Matter Number: 202409-26125309
        Right to Sue: Ives / Levo Funding, Inc.

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the Civil
Rights Department (CRD) in accordance with Government Code section 12960. This
constitutes service of the complaint pursuant to Government Code section 12962. The
complainant has requested an authorization to file a lawsuit. A copy of the Notice of
Case Closure and Right to Sue is enclosed for your records.

Please refer to the attached complaint for a list of all respondent(s) and their
contact information.

No response to CRD is requested or required.

Sincerely,

Civil Rights Department

CRD - ENF 80 RS (Revised 2024/05)

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

### Civil Rights Department
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

September 9, 2024

Christopher Ives

,

RE:    **Notice of Case Closure and Right to Sue**
       CRD Matter Number: 202409-26125309
       Right to Sue: Ives / Levo Funding, Inc.

Dear Christopher Ives:

This letter informs you that the above-referenced complaint filed with the Civil Rights Department (CRD) has been closed effective September 9, 2024 because an immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this CRD Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,


Civil Rights Department

## COMPLAINT OF EMPLOYMENT DISCRIMINATION
## BEFORE THE STATE OF CALIFORNIA
### Civil Rights Department
**Under the California Fair Employment and Housing Act**
**(Gov. Code, § 12900 et seq.)**

**In the Matter of the Complaint of**

Christopher Ives                                                                CRD No. 202409-26125309

                                                Complainant,

vs.

Levo Funding, Inc.
27 Golf Drive
Aliso Viejo, CA 92656

                                                Respondents

---

**1.** Respondent **Levo Funding, Inc.** is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

**2**. Complainant **Christopher Ives**, resides in the City of **,** State of **.**

**3.** Complainant alleges that on or about **February 21, 2024**, respondent took the following adverse actions:

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment and as a result was terminated, denied any employment benefit or privilege.

**Additional Complaint Details:**

-1-
*Complaint – CRD No. 202409-26125309*

Date Filed: September 9, 2024

CRD-ENF 80 RS (Revised 2024/05)

VERIFICATION

I, **Brian Koegle**, am the **Attorney** in the above-entitled complaint.  I have read the foregoing complaint and know the contents thereof.  The matters alleged are based on information and belief, which I believe to be true.

On September 9, 2024, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**Santa Clarita, CA**

-2-
*Complaint – CRD No. 202409-26125309*

Date Filed: September 9, 2024

CRD-ENF 80 RS (Revised 2024/05)