# EXHIBIT 1



April 11, 2025

VIA EMAIL (aellington@mfamilyindustries.com)

Ms. Afiyfa H. Ellington, Esq.
695 Cross Street, Suite 281
Lakewood, NJ 08701

**Re:**  **Defendant Christopher Ives's Notice of Motion Seeking Rule 11 Sanctions Against You and Your Client in** *Miller Family Industries, Inc. v. Christopher Ives***, No. 1:25-cv-02923 (S.D.N.Y.) ("NY Action")**

Dear Ms. Ellington:

We represent Defendant Christopher Ives in the above-referenced NY Action and write to provide you with the attached Notice of Motion Seeking Sanctions Pursuant to Rule 11, *see* Exhibit A ("Notice of Motion"), and to demand that you withdraw your offending Verified Complaint dated February 21, 2025 ("Complaint") against our client pursuant to Rule 11's safe-harbor provisions. *See generally* Fed. R. Civ. P. 11(c). As will be explained more fully below, you and your client, Miller Family Industries, Inc. ("MFI"), clearly instituted the NY Action for the improper purpose of harassing Mr. Ives and needlessly increasing his costs of litigation. To wit, not only did you pack the Complaint full of fabrications and internal contradictions, you purposely decided not to attach the relevant Memorandum of Understanding ("MOU") or inform the Court that it contains an unambiguous choice-of-forum clause selecting *Delaware* courts as the *exclusive* venue. And it is no accident that you filed the NY Action on the very day that there was a hearing concerning sending a related California lawsuit by Mr. Ives to arbitration. Thus, even if you attempt to amend your spurious Complaint to try to remove all the egregious misrepresentations and correct the unprofessional elision regarding the Delaware venue, you will still be prosecuting the NY Action in rank bad faith and for a patently improper purpose, and we will indeed still seek sanctions for your having filed the Complaint and commenced the NY Action in the first place.

Moreover, the court will be forced to strike the current Complaint because it is not signed by an attorney. Rule 11(a) provides that "[e]very pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name." Fed. R. Civ. P. 11(a). It also mandates that "[t]he court *must* strike an unsigned paper unless the omission is promptly corrected after being called to the attorney's or party's attention." *Id.* (emphasis added). Make no mistake, if you dare to refile the current Complaint with an attorney's signature to attempt to continue or prolong the NY Action, we will certainly file a motion for sanctions, as you would be filing a pleading that you now know for sure to be sanctionable.

***Therefore, to be perfectly clear: Barring unforeseen circumstances, we <u>will</u> file a motion for sanctions in the NY Action if you do not dismiss the lawsuit in its entirety and withdraw the Complaint's baseless and vexatious claims and allegations against Mr. Ives.***

As you know, Rule 11 of the Federal Rules of Civil Procedure imposes a duty to present factual allegations that "have evidentiary support," Fed. R. Civ. P. 11(b)(3), legal claims that are "warranted by existing law," Fed. R. Civ. P. 11(b)(2), and prohibits filings made "for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation," Fed. R. Civ. P. 11(b)(l). Similarly, 28 U.S.C. § 1927 provides: "Any attorney . . . admitted to conduct cases in any court of the United States . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." The Complaint filed in this case, however, demonstrates that you and you client wholeheartedly abandoned any attempt to comply with Rule 11 or 28 U.S.C. § 1927, as applicable.

There can be no doubt that the NY Action was improperly instituted to harass Mr. Ives, publicly smear his reputation, and needlessly increase his litigation costs by forcing him to defend a suit in New York. Current CEO and former Chief Legal Officer of Levo Funding, Inc. ("Levo"), Jenny Merris—who is responsible for significant misconduct regarding Mr. Ives, Levo, and MFI as set forth below—threatened Mr. Ives not to take legal action against MFI or Levo. Among her many threats, Ms. Merris warned that MFI would retaliate by attempting to "hurt" Mr. Ives, including by seeking to litigate against him in New York, with the clear implication that New York would be an expensive, far-away, and inconvenient venue for Mr. Ives to defend a lawsuit in. Additionally, Ms. Merris admonished that a suit by Mr. Ives would imperil his "reputation." Ms. Merris' bluster about Mr. Ives's "reputation" echoes an intimidation gambit by MFI's Alan Miller, who responded to Mr. Ives' California suit by directly messaging him that MFI would "be filing as a counter suit including fraud and misrepresentations [sic] which could hurt your reputation in the industry."

The timing and contents of the Complaint further confirm that the NY Action was commenced only to harass Mr. Ives and force him to expend unnecessary money litigating in New York. You purposely filed the NY Action on the very day that a court in California held a hearing compelling arbitration of Mr. Ives's lawsuit against Levo. *See* Exhibit B (Tentative Ruling for February 21, 2025 Hearing). In other words, you waited to file the NY Action until you knew it would be impossible for Mr. Ives to argue that venue would be more convenient" in an already-pending California court action. And egregiously, your Complaint does not attach the relevant Memorandum of Understanding or inform the Court that the MOU contains a clause in which the "parties irrevocably consent to the exclusive jurisdiction and venue of the state or federal courts of the State of Delaware." *See* MOU ¶ 6 (Exhibit C).

Indeed, the Complaint's entire purported basis for bringing suit in New York is fabricated, one of the many misrepresentations and contradictions that conclusively demonstrate you did not fulfill your Rule 11 duty to conduct "an inquiry reasonable under the circumstances" to ensure the Complaint's "factual contentions have evidentiary support." Fed. R. Civ. P. 11(b)(3). It is simply not true that Mr. Ives initiated the idea for Levo or had significant discussions regarding its



founding with MFI principals Alan and Abraham Miller in New York. *See* Compl. ¶ 7. In reality, Mr. Ives met with the Millers in New York just once, at an industry event's hotel lobby bar on May 8, 2023, for a mere 15 minutes that included no substantial negotiations. Indeed, Meeting Minutes on May 1, 2023, and other email correspondence discussed *infra* prove that negotiations were either completed or well underway by May 8, 2023. In sum, the allegations set forth in paragraph 7 of the Complaint are a demonstrable fiction.

Many of the Complaint's other allegations are likewise false or contradictorily impossible, and therefore illustrate that you did not conduct the bare minimum investigation before filing. For example, a simple review of email correspondence proves that Mr. Ives did not prepare any "projected financial data for MFI's review." Compl. ¶ 10. Rather, financial projections were created and circulated via email by Wendy Peza, with assistance from Michael Renteria. Relatedly, neither these financial projections, nor the MOU itself, promised "a minimum twenty percent (20%) return on investment" "within the first six (6) months of operation." *Id.* ¶ 9. There is no such promise or guarantee anywhere in the MOU, which contains an "Entire Understanding" clause superseding all other understandings. MOU ¶ 16. You could (and should) have simply determined from the face of the MOU that this 20% return allegation was false and contradicted the actual agreement between the parties as embodied in the MOU. Moreover, had you simply looked at the actual financial projections created and circulated by Wendy Peza, you would have again realized that it did not promise an unrealistic 20% return in a mere 6 months. With these and all the additional examples of falsehoods, misrepresentations, and elision enumerated below, you cannot possibly have filed the Complaint in good faith and believed that its "factual contentions have evidentiary support." Fed. R. Civ. P. 11(b)(3).

Finally, the NY Action is not "warranted by existing law" regarding clear choice-of-forum clauses and the Complaint's fatally deficient negligent misrepresentation claim, again underscoring that your true intent here is to harass Mr. Ives and cause him to waste money litigating in New York. Fed. R. Civ. P. 11(b)(2). The MOU's clear venue clause (in paragraph 6) is "presumptively valid under federal, New York, and" also Delaware "law." *Freeman v. Bianco*, 2003 WL 179777, at *5 (S.D.N.Y. Jan. 24, 2003) (Lynch, J.) (issuing order to show cause why plaintiff should not be sanctioned for claims that "could not be legitimately brought in this Court"); *West v. Access Control Related Enters., LLC*, 296 A.3d 378, 387 (Del. 2023) (reiterating that forum selection provisions are "presumptively valid"). Moreover, the Complaint's negligent misrepresentation claim is facially infirm, as it does not and could not allege the requisite "special relationship" between MFI and Mr. Ives that has been required by hundreds (if not thousands) of opinions analyzing New York law for many decades. Your filing thus completely ignores existing, governing law, is frivolous and has no chance of success, and accordingly warrants Rule 11(b)(2) sanctions.

It further bears emphasis that the MOU has a "Professional Fees" clause providing that "if any arbitration or litigation is necessary to enforce the terms of this MOU, the prevailing party will be entitled to recover its reasonable attorney's fees and costs." MOU ¶ 12. If we are required to



1501 BROADWAY, NEW YORK, NEW YORK 10036
EMAIL: CONTACT@PATRICKDOERR.COM   TEL.: (212) 680-4052

have a Court enforce the MOU's venue clause, we will certainly move for (and be entitled to) costs and attorney's fees thereunder.

For all these reasons and those described in detail below, sanctions against you and your client will be warranted if you refuse to withdraw the Complaint and dismiss the NY Action in its entirety.[1]

## I.     You and Your Client Deserve to Be Sanctioned Under Rule 11(b)(1) Because the NY Action and Complaint Were Filed for the Purpose of Harassing Mr. Ives, Tarnishing His Reputation with Falsehoods, and Needlessly Increasing His Costs of Litigation.

Substantial evidence, both direct and inferential, establishes that you and MFI instituted the NY Action and filed the Complaint for the express purpose of harassing, smearing, and increasing the litigation costs of Mr. Ives. *See* Fed. R. Civ. P. 11(b)(1). "Pursuant to Rule 11(b)(1) . . . [a] court may infer an improper purpose if, in light of Plaintiffs' conduct during and outside of litigation, a complaint is so baseless as to suggest that there is an ulterior motive behind the lawsuit." *An v. Despins*, 2023 WL 4931832, at *6 (S.D.N.Y. Aug. 2, 2023). Indeed, "[t]he deficiency of [the plaintiff]'s claim, coupled with its behavior in th[e] litigation," can "give[] rise to an inference of improper purpose," including where "[plaintiff]'s behavior exemplifies impermissible forum-shopping." *S. Pac. Shipping Co. v. Redi-Fresh Produce Inc.*, 2014 WL 6968039, at *10 (S.D.N.Y. Dec. 9, 2014). As a prominent example, then-District Judge Lynch issued an order to show cause "why either plaintiffs or their attorney or both should not be" sanctioned under Rules 11(b)(1) and (b)(2), including because "[t]he agreements that are at the heart of the complaint both contain clear choice of forum clauses specifying that any action relating to the subject matter of this suit be brought in Florida" and thus plaintiffs' claims "could not be legitimately brought in this Court." *Freeman v. Bianco*, 2003 WL 179777, at *5–*7 (S.D.N.Y. Jan. 24, 2003) (Lynch, J.).

Of course, New York federal courts also recognize "direct evidence of [a plaintiff]'s bad faith desire to use the judicial process to harass" or needlessly increase the costs of litigation. *S. Pac. Shipping*, 2014 WL 6968039, at *10. To wit, the *South Pacific Shipping* court found bad faith

---

[1] In accordance with Federal Rule of Civil Procedure 11(c) and relevant Second Circuit decisions, this Letter and the enclosed Notice of Motion, together with the authorities cited in each, "describe the specific conduct that allegedly violates Rule 11(b)," and qualify as a "motion for sanctions" against you and your client as the parties responsible for the filing of the unfounded, frivolous, and harassing Complaint. *See Weiss v. David Benrimon Fine Art LLC*, 2021 WL 6128437, at *2 (2d Cir. Dec. 28, 2021) ("While the appellees did not send [the sanctioned plaintiff] their accompanying motion-to-dismiss brief, this was not required."); *see also Star Mark Mgmt. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170 (2d Cir. 2012). Indeed, "Rule 11(c)(2) requires only the service of '[a] motion' or '[t]he motion' . . . . It does not require the service of a memorandum of law or affidavits, nor does it use the words 'formal fully supported motion.'" *Malkan v. Mutua*, 699 F. App'x 81, 83–84 (2d Cir. 2017) (Mem.) (alterations in original) (quoting *Star Mark Mgmt.*, 682 F.3d at 176).



harassment where the plaintiff "warned that [defendant] would be 'playing with fire' if it complied with" a Court order. *Id.* Similarly, sanctions are appropriate where the "unrebutted testimony was that [plaintiff] said to [defendant] 'sue me' and '[i]t would take you a hundred thousand dollars to retain an attorney' and 'I'll tie you up for six years.'" *United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt–Meridian Constr. Corp.*, 890 F. Supp. 1213, 1228 (S.D.N.Y.1995), *aff'd in part, vacated in part*, 95 F.3d 153 (2d Cir. 1996) (upholding sanctions).

There is significant direct evidence here that MFI brought this suit to harass and improperly sully Mr. Ives's reputation. On or about February 15, 2024, after Jenny Merris had already wrongfully placed Mr. Ives on leave from Levo, she had a conversation with him in which she attempted to intimidate and strongarm him into not bringing suit against Levo or MFI. Among her many threats, Ms. Merris attempted to bully Mr. Ives by asserting that MFI is "ruthless"; that MFI would "crush" him; that MFI "would stop at nothing to hurt" him; and that MFI would "respond in kind" if he sued Levo or MFI. Ms. Merris also darkly warned that Mr. Ives needed to protect his "reputation" by not bringing suit: She said that "they've [MFI] already stolen your reputation, don't make them ruin it as well." Not coincidentally, Alan Miller made the exact same threat immediately after Mr. Ives filed suit against Levo. On September 20, 2024, within minutes of Mr. Ives's suit being filed, Alan Miller directly messaged Mr. Ives, stating: "it would be in your interest to understand that we will be filing as a counter suit including fraud and misrepresentations [sic] which could hurt your reputation in the industry." Unquestionably, then, MFI's own principal and its subsidiary's officer have admitted that the NY Action was filed for an improper purpose.

Moreover, you and MFI outrageously decided to bring this suit in New York, despite the MOU's clear and unambiguous venue clause selecting Delaware courts, to harass Mr. Ives and needlessly increase his costs of litigation. During the February 15, 2024 conversation in which Jenny Merris issued her barrage of threats to Mr. Ives, she warned that if Mr. Ives brought suit, MFI would take legal action in New York. Ms. Merris obviously knew (and strongly implied) that it would be unreasonably expensive and inconvenient for Mr. Ives to defend a lawsuit in New York—a forum that has no legitimate connection to this dispute and is renowned for having expensive attorneys and legal process.

As an attorney, you know just how wildly inappropriate it is to have brought this lawsuit in New York. The MOU's venue clause could not be more clear. (And even if there were no MOU venue clause, New York has no legitimate connection to this action: The parties are citizens of Delaware/New Jersey and California, and all relevant events happened in California, Texas, and/or New Jersey.) The fact that you did not attach the MOU to the Complaint, or alert the court to its venue clause therein, demonstrates that you know this action belongs in Delaware. Judge Lynch's opinion in *Freeman* is particularly instructive in this regard. There, the action was clearly time-barred under the statute of limitations, and Judge Lynch found it particularly noteworthy that the pleadings attempted to elide the untimeliness:

> While bad faith is no longer required to support an award of sanctions, the
> deliberate omission from the complaint of any reference to the dates of the



1501 BROADWAY, NEW YORK, NEW YORK 10036
EMAIL: CONTACT@PATRICKDOERR.COM   TEL.: (212) 680-4052

events alleged, and of the texts of the agreements in question (which would
have revealed those dates), strongly suggests that the plaintiffs and their
counsel were aware of the statute of limitations problem from the outset and
attempted to hide it.

*Freeman*, 2003 WL 179777, at *5 (citation omitted). Here, the Complaint's "deliberate omission"
of the MOU and its Delaware venue clause "strongly suggests" that you and your client "were
aware of the . . . problem from the outset and attempted to hide it." *Id.*

Judge Lynch's opinion also confirms that your purposeful decision to ignore the MOU's
Delaware venue clause represents a "manifest defect in the complaint." *Id.* at *6. He held:

The agreements that are at the heart of the complaint both contain clear
choice of forum clauses specifying that any action relating to the subject
matter of this suit be brought in Florida. Such clauses are recognized as
presumptively valid under federal, New York and Florida law. There is no
basis for disregarding the clauses in this case. The clauses in both contracts
are not boilerplate provisions in fine print on the back of a commercial
entity's form, but are clearly set forth in a specifically negotiated and drafted
agreement. As the venue chosen is the home venue of the plaintiffs, there is
nothing about it that is burdensome or unfair to them. Thus, regardless of
which jurisdiction's law applies, there is no question that even if the claims
asserted in the complaint were not time-barred, they could not be
legitimately brought in this Court.

*Id.* at *5 (citations omitted). Similarly, here, the MOU's venue clause is "clearly set forth in a
specifically negotiated and drafted agreement," and it has selected Delaware as the forum, which
is the "home venue" of MFI, meaning "there is nothing about it that is burdensome or unfair to
them." *Id.*

On top of all that, the timing of your filing the NY Action further solidifies its improper
purpose. You commenced the NY Action on February 21, 2025, the same day as a hearing in *Ives
v. Levo Funding, Inc.*, No. 24CU011858N (Cal. Super. Ct. San Diego Cty.) ("California Action"),
which confirmed that court's tentative ruling to compel arbitration of Mr. Ives's California court
claims against Levo. *See* Exhibit B (Tentative Ruling for February 21, 2025 Hearing). This timing
was not coincidental, but rather calculated to harass and overwhelm Mr. Ives. Moreover, it was
purposely designed so that Mr. Ives could no longer argue that MFI's claims in the NY Action
should have been brought in the California Action,[2] in furtherance of your underhanded scheme

---

[2] Under Delaware law, even in the face of a forum selection clause, the "doctrine of *forum non conveniens*
permits a court to decline to hear a case despite having jurisdiction over the subject matter and the parties
when there is a similar action pending elsewhere and when considerations of convenience, expense, and
the interests of justice dictate that litigation in the forum selected by the plaintiff would be unduly



to avoid the MOU's Delaware venue clause and force Mr. Ives to spend more money litigating in New York.

There is simply no good-faith justification for bringing this lawsuit in New York when you filed it, and indeed your client has expressly admitted that the true purpose of this action is to harass Mr. Ives and "hurt" him and his pockets with increased litigation costs. Consequently, Rule 11(b)(3) sanctions are well-deserved against you and your client, and you can rest assured that we will make a Rule 11 motion if you do not dismiss the NY Action entirely.[3]

## II.      Sanctions Are Warranted Under Rule 11(b)(3) Because the Complaint Is Self-Contradictory and Does Not Have Evidentiary Support.

You have failed to perform your duty to confirm that, after "an inquiry reasonable under the circumstances[,] . . . the factual contentions [in the Complaint] have evidentiary support." Fed. R. Civ. P. 11(b)(3). Importantly, "[a] baseless factual contention poses a greater threat to justice than a baseless legal contention," and thus warrants significant sanctions. *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 124, 128, 132 (S.D.N.Y. 2007) ("factual contention" that was "objectively without rational basis" and "utterly lacking in support" warranted imposition of sanctions for $750,000). Federal courts in New York will find that Rule 11 is violated where attorneys and their clients "fail[] to ensure a factual basis for each of their allegations." *Shetiwy v. Midland Credit Mgmt.*, 2014 WL 3739512, at *3 (S.D.N.Y. July 29, 2014).[4] And "[s]elf-contradictory assertions . . . clearly lack reasonable evidentiary support, in violation of Rule

---

inconvenient, expensive or otherwise inappropriate." *Aveta, Inc. v. Colon*, 942 A.2d 603, 607–08 (Del. Ch. 2008) (citations and internal quotation marks omitted).

[3] For all the same reasons, we will also move for sanctions against you pursuant to 28 U.S.C. § 1927. *See In re Auction Houses*, 2004 WL 2624896, at *4–*8 (S.D.N.Y. Nov. 18, 2004) (imposing § 1927 sanctions because "[i]n prosecuting the . . . Action, [plaintiff's attorney] has pursued claims in California that he should have known were, at least initially, required to be brought before this Court"); *see also Astornet Techs., Inc. v. BAE Sys., Inc.*, 201 F. Supp. 3d 721, 726–27 (D. Md. 2016) (imposing § 1927 sanctions where the "plaintiff's action [could] only be maintained against the Government in the Court of Federal Claims" yet plaintiff's counsel persisted in litigating in the District Court of Maryland even though attorney's "client ha[d] been advised of this fact several times").

[4] *Accord, e.g.*, *S. Pac. Shipping*, 2014 WL 6968039, at *9 ("Sanctions are warranted against counsel for the clearly deficient inquiry as to the facts underlying this claim, and against [plaintiff] for its actual knowledge of the factual and legal insufficiency of its claim."); *Gambello v. Time Warner Commc'ns, Inc.*, 186 F. Supp. 2d 209, 229 (E.D.N.Y. 2002) (imposing sanctions for failure to conduct reasonable inquiry prior to filing, where inquiry would have shown lack of evidentiary support for allegations); *Saltz v. City of New York*, 129 F. Supp. 2d 642, 646–47 (S.D.N.Y. 2001) (imposing Rule 11 sanctions for failure to "make a reasonable inquiry into the facts alleged in plaintiff's complaint" where plaintiff's counsel's pre-filing investigation consisted of barely more than interviewing his client).



11(b)(3)." *Colliton v. Cravath, Swaine & Moore LLP*, 2008 WL 4386764, at \*13–\*14 (S.D.N.Y. Sept. 24, 2008).

The Complaint is riddled with fabrication, misrepresentation, self-contradiction, and elision, much of which is either facially apparent or could be easily ascertained with a simple inquiry, and all of which merits sanctions. The overall facts underlying this dispute are rather simple: MFI failed to fund Levo pursuant to the terms set forth in the MOU, and as the business relationship began to sour, Jenny Merris undertook a series of guileful actions to save her own skin at the expense of Mr. Ives and ultimately Levo.

While we do not expect that you would characterize these events in a manner detrimental to your client, you nevertheless had a duty not to allege utter falsehoods, distortions, and prevarications. Yet you neglected this duty and instead filed a Complaint containing a staggering number of baseless allegations. The following are just ten (10) of the many spurious allegations pleaded in the Complaint (in roughly the order in which they appear), followed by a simple (and often glaringly obvious and straightforward) explanation illustrating why each is unfounded:

1. The Complaint incorrectly asserts that Mr. Ives approached MFI looking for an investment, alleging: "In the early spring of 2023, MFI was approached by the Defendant [Mr. Ives] regarding the creation and establishment of a proposed company . . . . In or about April of 2023, the Defendant first contacted MFI and conferred with its principals, Alan and Abraham Miller, regarding this proposal and request for capital to be provided by MFI to fund the operations of the proposed company." Compl. ¶¶ 7–8.

   a. In actuality, Wendy Peza (not Mr. Ives) was introduced to MFI and arranged the initial meeting between herself, MFI, and Mr. Ives. This can be quickly and easily verified through an examination of written communications.

2. The Complaint speciously alleges: "Defendant met with the principals of MFI, Alan and Abraham Miller in-person within the State of New York to discuss this proposal and capital request. During those initial discussions, the Defendant represented to MFI that he was running a business called Austin Business Finance d/b/a Back'D, a small business funding entity based in Austin, Texas, and that he was interested in creating a larger financial services company that would provide funding to small and medium size businesses in various parts of the country, including the States of California and Texas." Compl. ¶ 8.

   a. This allegation wildly mischaracterizes and misrepresents both the timeline of Levo's founding and the supposed "meeting" in New York between the Millers and Mr. Ives. In reality, Mr. Ives met with the Millers in New York at a hotel bar for 15 minutes during an industry event on May 8, 2023. There were no laptops, presentations, or materials at this "meeting," and no substantive terms regarding Levo or the MOU were discussed.



    b. Indeed, by this date (May 8, 2023), as recorded in multiple contemporaneous written documents, negotiations regarding Levo were either completed or well underway. For example, email conversations among, *inter alia*, Wendy Peza, Alan Miller, and Mr. Ives from May 3, 2023 through May 5, 2023, show that specific ownership percentages for Levo were already agreed upon. *See* Exhibit D (May 3–May 5, 2023 email correspondence). Indeed, MFI's own Meeting Minutes from May 1, 2023, reflect discussions regarding employee hires and roles, investment opportunities, ownership percentages, and back office support for Levo. *See* Exhibit E. (MFI's May 1, 2023 Meeting Minutes). They further note, among other things, that "Abe [Miller] has worked up a fund," "Alan and Abe [Miller] willing to deploy $100M to start," and that "Jenny [Merris] is working on the MOU" and "[w]ill get it to Alan and Abe by the end of the week," *i.e.*, before May 8, 2023. *Id.*

    c. The May 8, 2023 hotel-bar discussion is the <u>only</u> time Mr. Ives ever met with the Millers or MFI representatives in New York.

3. It is manifestly false that Mr. Ives purportedly "represented to Messrs. Alan and Abraham Miller, MFI's principals, that they could expect to receive, within the first six (6) months of operation of the new proposed company, a minimum twenty percent (20%) return on investment, and produced to MFI financial data supporting those projected financial returns." Compl. ¶ 9; *accord id.* ¶ 10 (incorrectly alleging that Mr. Ives supposedly "provided . . . projected financial data for MFI's review"); *id.* ¶ 11 (erroneously averring that Mr. Ives "represented . . . that the projected earnings of the proposed venture, based upon Defendant's prior experience, control of costs, business contacts, and financial projections would quickly produce a positive cash flow").

    a. This allegation directly contradicts the MOU—the written agreement among the parties that "supersedes any and all other prior or contemporaneous understandings, MOU ¶ 16—which contains no such expectation of 20% ROI within the first six (6) months, because no such representation or promise was made.

    b. As can be easily verified by a simple review of email traffic, Mr. Ives never sent or provided any "financial data" or "projections." Wendy Peza (and Michael Renteria) generated and provided all financial projections. *See* Ex. F (Email chain entitled "Requested Numbers").

    c. Moreover, Wendy Peza did not promise a 20% ROI in 6 months, but instead estimated in writing that for the Millers' "original capital investment returns—we are anticipating this to be in about 18–24 months from launch." Ex. D.



1501 BROADWAY, NEW YORK, NEW YORK 10036
EMAIL: CONTACT@PATRICKDOERR.COM   TEL.: (212) 680-4052

4. Mr. Ives never "represented . . . that proposed startup expenses and proposed labor costs would be minimal." Compl. ¶ 11.

    a. As previously explained, all financial projections provided to MFI were prepared and distributed by Wendy Peza and Michael Renteria. These financial projections were detailed, including items such as salaries, software expenses, launch costs, rent, and hardware.

    b. MFI reviewed and agreed to these projected operating expenses, so the Millers cannot now claim that they were blindsided by the expenses or that any representations regarding them were "false." *Id.*

    c. Indeed, in the MOU, MFI agreed to provide "monthly" $2 million to $5 million contributions "for operating capital (not including administrative costs for salaries, and other related matters)," and recognized that the parties would "build out the operations of proposed limited liability company, including customer relationship management systems, underwriting procedures, operational processes, loan management and accounting systems, relationships with independent sales organizations and strategic partners, sales training materials, and marketing strategies." MOU ¶ 2(a) – (b). Plainly, "build[ing] out" these "systems," "processes," and "materials" would require the outlay of significant money, not just "minimal" expense.

5. MFI outright lies by alleging that Mr. Ives "was willing to put up a considerable amount of his own capital to assist with funding the new venture [Levo]." Compl. ¶ 11.

    a. The MOU again squarely contradicts this baseless fabrication, as it nowhere calls for Mr. Ives to contribute any funding, and instead requires MFI to provide all funding. *See* MOU ¶ 2. Mr. Ives was in no position at the time to provide any funding and unequivocally never promised to do so.

6. MFI knows for certain that it is completely untrue that Mr. Ives allegedly "caused the company [Levo] to continue producing false and misleading monthly financial statements, as well as false and misleading financial data projections for 2024 and 2025 to Alan and Abraham Miller, MFI's principals, after [Mr. Ives] began running the new business [Levo]." Compl. ¶ 14; *accord id.* ¶ 13 (falsely alleging that Mr. Ives "produced misleading monthly operating statements").

    a. Mr. Ives did not produce Levo's financial statements or reports or projections. Rather, Michael Renteria produced all of Levo's financial documents, and MFI knows this. MFI controller Joseph Shoenfeld had a reoccurring weekly meeting with Mr. Renteria where the two reviewed Levo's finances together. Notably, no concerns with these financials were ever raised to Mr. Ives during his tenure at Levo.

7. The Complaint incorrectly alleges that Mr. Ives "utilized [Levo's] funds to wrongfully exceed the company's budget, pad expenses, and increase company payroll absent



1501 BROADWAY, NEW YORK, NEW YORK 10036
EMAIL: CONTACT@PATRICKDOERR.COM   TEL.: (212) 680-4052

approval of the board of directors" and that he supposedly "hired certain employees without obtaining the approval of the board of directors [and] represented that an employee's salary would be a certain amount but subsequently increased it without MFI's knowledge." *Id.* ¶ 14.

    a. A simple email search will reveal a communication from MFI to Mr. Ives praising Mr. Ives for being budget conscious while simultaneously reprimanding Wendy Peza and Michael Renteria for their spending. Notably, MFI never communicated any concern to Mr. Ives about Levo being over budget—because Levo was not over budget in any category. In fact, Mr. Ives's good management caused Levo to be *under* budget, such as when he secured a fully furnished office for $12,500 per month even though the budget had allocated $20,000 per month. And despite Ms. Peza and Mr. Renteria clamoring to use the leftover $7,500 on a superfluous (second) office in Austin, Mr. Ives held firm and consequently saved Levo significant money.

    b. Mr. Ives never increased payroll or hired employees without board approval, and you cannot find or produce any evidence of his doing so (because it did not happen). In fact, Mr. Ives prevented Michael Renteria from hiring an accountant without board approval, and also stopped Jenny Merris from favoring her employees with unjustified 25% salary increases she requested in early January 2024. If anything, Mr. Ives prevented the very conduct he is now falsely being accused of having undertaken.

    c. Mr. Ives never increased any employee's salary above the board-approved budget. At one point, Michael Renteria's compensation was changed from a $150,000 salary plus a $25,000 bonus to a $175,000 salary because it made more sense under the circumstances, but this was still in line with the $175,000 allocated to him in the original budget. Indeed, MFI inquired about the change, Levo provided an explanation, and MFI had no further questions or issues with the change. Moreover, Mr. Ives prevented Wendy Peza and Jenny Merris from pointlessly increasing Mr. Renteria's salary to $225,000, as Mr. Ives stated that he would rather accept Mr. Renteria's resignation if he kept demanding a salary higher than the one he had originally negotiated.

    d. The Complaint also conveniently neglects to mention that Mr. Ives spent the vast majority of the funds contributed by MFI on deals that built Levo a portfolio in excess of $5 million by the time of his departure and that the company was months away from being self-sufficient.

8. It is unequivocally false that Mr. Ives "extend[ed] a business trip for personal enjoyment." *Id.*



    a. There is, and can be, no record that Mr. Ives extended any trip or used company funds for any personal reasons, because that simply did not happen.

    b. Mr. Ives traveled for business on three (3) occasions during his tenure with Levo—to New York, Miami, and Washington, D.C. He provided Levo's accounting function with all receipts and they were verified as business uses. Moreover, all these trips were planned with the entire executive team's knowledge and approval, which can be easily verified by reviewing contemporaneous written communications. MFI also has access to all of Mr. Ives's receipts, travel expenses, and records of whom he met with, when, and why.

9. It is categorically untrue that Mr. Ives allegedly "prohibited any communication between Alan and Abraham Miller, on the one hand, and other executives of Levo Funding, Inc., on the other hand, without Defendant being present." *Id.*

    a. In fact, there was significant communication directly between MFI and Wendy Pexa and Jenny Merris, which is memorialized in emails and calls among them. Furthermore, as explained above, Michael Renteria had a weekly meeting with MFI controller Jospeh Shoenfeld that was not attended by Mr. Ives.

    b. This is another example of the Complaint speciously attributing other employees' behavior to Mr. Ives. It was Jenny Merris who prohibited Mr. Ives from communicating with MFI without her blessing and/or oversight in the weeks before he was wrongfully terminated. For example, Mr. Ives devised a substantial cost-saving plan for Levo—reducing salaries and personnel by over 50%, and further lowering operating costs with software changes. Instead of sharing it with MFI, he was forced to provide it to Ms. Merris as an intermediary.

10. The Complaint's own allegations contradict its incorrect assertion that "MFI performed under the terms of the [MOU]." *Id.* ¶ 39.

    a. The Complaint alleges that MFI "advance[d] more than $5,925,000.00 over the course of the ensuing six (6) months" to Levo after it was incorporated "within ninety (90) days of the date of the execution of the [MOU]." *Id.* However, this demonstrates that MFI did not meet its funding obligations under the MOU, which required: "MFI will undertake to [Levo] the monthly sum of two to five million ($2,000,000.00 - $5,000,000.00) . . . with the firsts [sic] monthly contribution contemplated to begin within ninety (90) days of formation of the proposed company." *Id.* Thus, that advance of $5,925,000 was well below the figure that MFI was obligated to contribute, so it did not perform under the MOU.



1501 BROADWAY, NEW YORK, NEW YORK 10036
EMAIL: CONTACT@PATRICKDOERR.COM   TEL.: (212) 680-4052

Suffice it to say, the Complaint is not only full of falsehoods,[5] but many of its fabrications are directly contradicted by the MOU itself—which is likely another reason that you brazenly chose not to attach it to the Complaint or include most of its actual terms therein. As explained above, New York courts will not take kindly to this purposeful omission, and the Complaint's "[s]elf-contradictory assertions" necessarily "lack reasonable evidentiary support, in violation of Rule 11(b)(3)." *Colliton*, 2008 WL 4386764, at *13–*14. Indeed, the allegations in the Complaint conclusively demonstrate that MFI itself breached the MOU, making it particularly egregious that you brought a claim for breach of contract, as such a cause of action requires that MFI performed under the contract (which it did not). This is yet another claim not "warranted by existing law," Fed. R. Civ. P. 11(b)(2), as will be addressed in the next section.

To reiterate, if you do not withdraw <u>all</u> of the false factual allegations in the offending Complaint, we will move for sanctions pursuant to Rule 11(b)(3).

**III.    You and Your Client Deserve to Be Sanctioned Pursuant to Rule 11(b)(2) Because the Complaint's Claims Are Not Warranted by Existing Law Insofar as They Are Frivolous and Have No Chance of Success in the NY Action**

It is truly an outrage that you filed this lawsuit in New York despite clearly being aware of the MOU's choice-of-forum clause. It unambiguously provides:

> **<u>Governing Law and Venue.</u>** This MOU and the rights and obligations of the Parties hereunder shall be governed, construed and their provisions interpreted by, under and in accordance with, the laws of the State of Delaware (excluding the laws applicable to conflicts or choice of law). The Parties hereto, to the extent that they may legally do so, hereby irrevocably consent to the exclusive jurisdiction and venue of the state or federal courts of the State of Delaware.

MOU ¶ 6. As explained above, this venue clause is "presumptively valid" under Delaware, New York, and federal law. *West*, 296 A.3d at 387; *Freeman*, 2003 WL 179777, at *5. Yet you not only disregarded this clause but also tried to hide it from the court by not attaching the MOU to the Complaint or discussing its venue provision therein, and sanctions consequently should be imposed under Rule 11(b)(2) since you have no chance of succeeding in litigating this suit in New York. *See Freeman*, 2003 WL 179777, at *5–*7; *see also Ammann v. Sharestates, Inc.*, 2024 WL 1956237, at *5–*11 (E.D.N.Y. Mar. 21, 2024) (claim frivolous and sanctionable under Rule 11(b)(2) where it is "legally unreasonable such that it has no chance of success"); *Michod v. Walker*

---

[5] Astoundingly, the Complaint contains even more misrepresentations and mischaracterizations than those listed above. If you actually conduct a reasonable inquiry pursuant to your Rule 11 duties, you should be able to identify them, and thus Mr. Ives reserves the right to include them in any future Rule 11 motion.



*Magnetics Grp.,* 115 F.R.D. 345, 346–47 (N.D. Ill. 1987) (sanctioning plaintiff and plaintiff's counsel for the "impropriety of their assertion of venue").

      Moreover, sanctions are appropriate for filing a negligent misrepresentation claim that is fatally deficient under "[o]verwhelming and longstanding precedent." *Ammann*, 2024 WL 1956237, at *6. Hundreds, if not thousands, of New York cases hold that a plaintiff seeking recovery under a theory of negligent misrepresentation must allege and prove a "special relationship" between the plaintiff and defendant. *See, e.g.*, *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 180 (2011); *RIA R Squared, Inc. v. DW Partners, LP*, 230 A.D.3d 983, 986 (1st Dep't 2024). But your complaint does not, and cannot, allege such a special relationship between MFI and Mr. Ives, and therefore your negligent misrepresentation claim is frivolously sanctionable for being "patently untenable" and having "no chance of success." *An*, 2023 WL 4931832, at *5; *Ammann*, 2024 WL 1956237, at *5–*11.

      Accordingly, Mr. Ives will also seek sanctions pursuant to Rule 11(b)(2) for your patently frivolous suit and claims if you do not dismiss the NY Action in its entirety.

\* \* \*

      For all the foregoing reasons, it is incumbent upon you and your client to take immediate action to rectify the sanctionable actions set forth in this Letter and the accompanying Notice of Motion. We hereby demand that you withdraw all claims and allegations in the offending Complaint and dismiss the NY Action in its entirety pursuant to Rule 11's safe harbor provisions.

      This letter is not a full or complete expression of the law or facts that apply to this matter, and is without prejudice to the rights or remedies of our clients, all of which are hereby reserved and preserved.

Sincerely,

Michael S. Marron, Esq.

cc:    Michael Patrick, Esq. (*via email*)
       Mark T. Doerr, Esq. (*via email*)



1501 BROADWAY, NEW YORK, NEW YORK 10036
EMAIL: CONTACT@PATRICKDOERR.COM   TEL.: (212) 680-4052

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MILLER FAMILY INDUSTRIES, INC.,

                Plaintiff,

    -against-

CHRISTOPHER IVES,

                Defendant.

---

Case No. 1:25-cv-02923-LJL

ORAL ARGUMENT REQUESTED

### Defendant Christopher Ives's Notice of Motion Seeking Sanctions Pursuant to Fed. R. Civ. P. 11 and 28 U.S.C. § 1927

PLEASE TAKE NOTICE that, upon all papers served and proceedings had herein, including the letter dated April 11, 2025, from Michael S. Marron, Esq., counsel for Defendant Christopher Ives, and such other and further papers and proceedings as may be filed or had, Defendant will move this Court, at a date and time to be determined by the Court, before the Honorable Lewis J. Liman, United States District Judge, at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, Courtroom 15C, New York NY 10007, for an order imposing sanctions against Plaintiff Miller Family Industries, Inc. ("MFI"), and its counsel, Afiyfa H. Ellington, Esq., pursuant to Fed. R. Civ. P. 11(c) and 28 U.S.C. § 1927 (as applicable to counsel). Specifically, Defendant seeks an order awarding sanctions, dismissing the Complaint (ECF No. 1-1), awarding attorneys' fees and costs incurred by Defendant as a result of violations of Rule 11 and 28 U.S.C. § 1927, and granting such other and further relief as the Court deems just and proper. Defendant further respectfully requests oral argument on this motion.

Defendant brings this motion on the grounds that Plaintiff and its counsel violated Rule 11(b)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927 (as applicable to counsel)

by instituting this action and filing the Complaint in New York for the improper purpose of harassing Mr. Ives and needlessly increasing his costs of litigation, as the Memorandum of Understanding ("MOU") underlying Plaintiff's Complaint has a clear choice-of-forum clause selecting Delaware courts as the exclusive venue for disputes, and MFI's principal and an officer/employee of its subsidiary Levo Funding, Inc. ("Levo"), threatened Mr. Ives that MFI would "hurt" him and "ruin" his "reputation" if he filed suit against MFI or Levo, and MFI subsequently filed this action after Mr. Ives's lawsuit against Levo in California was sent to arbitration. Defendant also brings this motion pursuant to Rule 11(b)(3) on the grounds that Plaintiff and its counsel did not conduct an "inquiry reasonable under the circumstances" to ensure that the allegations in the Complaint "have evidentiary support," as the Complaint is riddled with falsehoods, fabrications, misrepresentations, self-contradictions, and elision. Finally, Defendant brings this motion pursuant to Rule 11(b)(2), as Plaintiff's preposterous choice of venue flagrantly disregards the MOU's choice-of-forum clause and its negligent misrepresentation claim is woefully deficient, rendering this action and the Complaint not "warranted by existing law."

Dated: New York, New York
        April 11, 2025

Respectfully submitted,

PATRICK | DOERR PLLC

/s/ Michael Marron
Michael S. Marron, Esq.
michael.marron@patrickdoerr.com

**PATRICK│DOERR**

1501 Broadway, Suite 2310
New York, New York 10036
Telephone: (212) 680-4052

*Attorneys for Defendant Christopher Ives*

2

# EXHIBIT B

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SAN DIEGO
## NORTH COUNTY COURTHOUSE

### TENTATIVE RULINGS - February 20, 2025

HEARING DATE:  2/21/2025        HEARING TIME:  1:30 P.M.        DEPT.:  N-28

JUDICIAL OFFICER:  Hon. Earl H. Maas, III

CASE NO.:24CU011858N

CASE TITLE:  Ives vs Levo Funding

CASE TYPE:  (U)Defamation

HEARING TYPE:  Motion to Compel Arbitration

---

Defendant Levo Funding, Inc.'s ("Defendant") motion to compel arbitration and stay action (ROA # 12) is granted.

## *Factual Background*

On July 17, 2023, Plaintiff Christopher Ives ("Plaintiff") and Defendant, by and through its President Alan Miller, entered into a contract entitled Employment Agreement. (Merris Decl., ¶ 5, Ex. 1; Plaintiff Decl., ¶ 3.) The Employment Agreement called for Plaintiff to serve as CEO of Defendant for a term of three years in exchange for compensation as detailed in Section 3 of the Employment Agreement. (Merris Decl., ¶ 5, Ex. 1.) Plaintiff does not dispute he executed the Employment Agreement.

Contained within the body of the Employment Agreement is a section entitled 'Arbitration.' (Merris Decl., Ex. 1, § 7.) The Arbitration section of the Employment Agreement is extremely broadly stating "any past, present, or future dispute, controversy, or claim arising under or relating to this Agreement, arising under any federal, state, or local statute, regulation, law, ordinance, or the common law (including but not limited to any law prohibiting discrimination), and/or under any other confidentiality or non-disclosure agreement, and/or in connection with [Plaintiff's] employment, or termination thereof…shall be submitted to binding arbitration as provided herein." (Merris Decl., ¶ 5, Ex. 1.) The agreement details California law, including federal law as applied in California courts, will apply. (Merris Decl., ¶ 5, Ex. 1.)

The arbitration provision includes a strict confidentiality provision which states, "[t]he arbitration shall be conducted on a strictly confidential basis, and no Party, arbitrator, or other person or entity shall disclose the existence of a claim, the nature of a claim, any documents, correspondence, pleadings, briefing, exhibits, or information exchanged or presented in connection with such a claim, or any rulings, decisions, or results of any claim or argument…to any third party, with the sole exception of the Parties' legal counsel, who also shall be bound by these confidentiality terms." (Merris Decl., ¶ 5, Ex. 1.)

The agreement to arbitrate is silent as to discovery or the costs associated with arbitration, though it does note any arbitration pursuant to the Employment Agreement shall be administered by the American Arbitration Association ("AAA")…[and] conducted in accordance with the AAA Arbitration Rules for Employment Disputes…" (Merris Decl., Ex. 1.)

## *Existence of an Agreement to Arbitrate*

---

CASE NUMBER: 24CU011858N
CASE TITLE: Ives vs Levo Funding

"On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party to the agreement refuses to arbitrate that controversy, the court shall order the [parties] to arbitrate the controversy if it determines that an agreement to arbitrate exists…" (*Code Civ. Proc.* § 1281.2.) The party moving to compel arbitration bears the initial burden of proving, by a preponderance of the evidence, an agreement to arbitrate exists. (*Ruiz v. Moss Bros. Auto Group, Inc.* (2014) 232 Cal.App.4th 836, 842.)

Here, the Court finds Defendant has met its initial burden of establishing an agreement to arbitrate exits by attaching and authenticating a copy of the executed Employment Agreement.

### *Plaintiff's Challenges to the Application Agreement*

After the existence of an agreement to arbitrate is established, the party opposing an agreement bears the burden of proving by a preponderance of the evidence any fact necessary to a defense. (*Ruiz, supra,* 232 Cal.App.4th at p. 842.) "A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is is valid, enforceable and irrevocable, save upon such grounds for the revocation of any contract." (*Code Civ. Proc.* § 1281.)

Plaintiff argues the arbitration provision of the Employment Agreement is unconscionable under both California and federal law and otherwise deficient under California law because: (a) it must specifically state the arbitrator is neutral; (b) it doesn't "specifically provide for more than minimal discovery"; (c) it limits the type of relief Plaintiff can obtain in court by prohibiting <u>any</u> recourse in courts and requiring "strict confidentiality"; (d) it's silence on who is to bear the costs associated with arbitration implies the costs will be split and such a split has been held unconscionable in California; and (e) it seeks to serve as a vehicle for the waiver of Plaintiff's statutory rights under FEHA.

### *Unconscionability*

Plaintiff challenges the Application Agreement as unconscionable. Unconscionability has both a procedural and substantive element. Both elements must be present for a court to refuse to enforce a contract, but they are evaluated on a "sliding scale" and "need not be present in the same degree." (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114.) The more substantively oppressive the contract term, the less procedural unconscionability is required to conclude that the term in unconscionable, and vice versa. (*Lane v. Francis Capital Management LLC* (2014) 224 Cal.App.4th 676, 689.)

If a court, as a matter of law, "finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." (*Civ. Code* § 1670.5(a).)

### Procedural Unconscionability

Procedural unconscionability requires "oppression" or "surprise." (*Lane, supra,* 224 Cal.App.4th at p. 689.) "Oppression occurs where a contract involves a lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form." (*Ibid.*) "Surprise" covers "a variety of deceptive practices and tactics, including hiding a clause in a mass of fine print or phrasing a clause in language that is incomprehensible to a layperson." (*Penilla v. Westmont Corp.* (2016) 3 Cal.App.5th 205, 216.)

CASE NUMBER: 24CU011858N
CASE TITLE: Ives vs Levo Funding

Procedural unconscionability can exist where a stronger party drafts the contract and presents it to the weaker party on a take-it-or-leave-it basis. While an adhesion contract is not automatically unenforceable as unconscionable if the contractual terms fall "outside the reasonable expectations of the weaker party" it may be unenforceable. (See *Serafin v. Balco Properties Ltd., LLC* (2015) 235 Cal.App.4th 165, 179.)

Plaintiff argues the agreement to arbitrate is procedurally unconscionable because: (a) he was not permitted to negotiate the terms of or the inclusion of the arbitration provision at or around the time he signed it (Plaintiff Decl., ¶¶ 5-6); (b) it was prepared exclusively by Defendant and presented to Plaintiff as a completed, non-negotiable document, and thus, was a contract of adhesion (Plaintiff Decl., ¶¶ 4-6); and (c) the arbitration provision does not explicitly list the rules of the arbitration (Plaintiff Decl., ¶ 7). In response to these arguments, Defendant presents declaratory evidence that Plaintiff was involved in the negotiation of the Employment Agreement, was an executive with bargaining power, and Defendant's failure to attach the arbitration rules is not procedurally unconscionable (see *Trevdi v. Curexo Tech. Corp.* (2010) 189 Cal.App.4th 387).

After consideration of the totality of evidence presented by all parties in conjunction herewith, the Court finds the agreement to arbitrate contains a diminutive level of procedural unconscionability. While the Court is convinced Plaintiff engaged in negotiating some aspects of the Employment Agreement, the Court is not convinced Plaintiff meaningly engaged in negotiating *all* of the terms of the Employment Agreement. While the level of procedural unconscionability is certainly minimized by Plaintiff's stature as an executive and not an unskilled worker, the Court finds there exists a diminutive level of procedural unconscionability due to the nature of presentation of the Employment Agreement to Plaintiff.

Substantive Unconscionability

Substantive unconscionability focuses on "overly harsh" or "one-sided" terms or results. (*A&M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 486-487.) In *Armendariz*, the California Supreme Court adopted five "minimum requirements" for the "lawful arbitration" of statutory workplace rights. (*Armendariz, supra,* 24 Cal.4th at p. 102.) An agreement is lawful if it: "(1) provides for neutral arbitrators, (2) provides for more than minimal discovery, (3) requires a written award, (4) provides for all of the types of relief that would otherwise be available in court, and (5) does not require employees to pay either unreasonable costs or any arbitrators' fees or expenses as a condition of access to the arbitration forum." (*Ibid.*) Our Court of Appeal has subsequently held the "[e]limination of or interference with any of these basic provisions makes an arbitration agreement substantively unconscionable." (*Wherry v. Award, Inc.* (2011) 192 Cal.App.4th 1242, 1248.)

Plaintiff argues the arbitration provision of the Employment Agreement is substantively unconscionable because: (a) it's silence on costs infers cost sharing between Plaintiff and Defendant; and (b) requires strict confidentiality for any and all topics associated with this dispute. Though addressed separately, the Court interprets the following arguments of Plaintiff as also addressing substantive unconscionability: (a) the arbitration provisions failure to specifically state the arbitrator is to neutral; (b) the failure to ensure more than minimal discovery; (c) limitations on the type of relief Plaintiff can obtain from courts based, in part, on the arbitration provision's strict confidentiality provision; and (d) the arbitration provision cannot limit Plaintiff's rights under FEHA.

After consideration of the totality of evidence presented by all parties in conjunction herewith, the Court finds the agreement to arbitrate contains a moderate to high level of substantive unconscionability. While the Court declines to engage in a lengthy discussion concerning it finds the arbitration provision's silence regarding costs and failure to ensure more than minimal discovery substantively unconscionable. Additionally, the arbitration provision's extremely broad "strict confidentiality" provision contravenes both California and federal law.

CASE NUMBER: 24CU011858N
CASE TITLE: Ives vs Levo Funding

Despite the foregoing, the Court finds the agreement to arbitrate contains "evidence of an intent to sever any illegal provision" (see *Keene v. Harling* (1964) 61 Cal.2d 318, 321), and, thus, the agreement to arbitrate can be enforced subject to remedying the unconscionable provisions therein. The Court does not find the agreement to arbitrate is so permeated by unconscionability so as to render the agreement unenforceable.

## *Ruling*

In sum, Defendant's motion to compel arbitration and stay action (ROA # 12) is granted. The Court finds the arbitration provision of the Employment Agreement shows a diminutive level of procedural unconscionability and a moderate to high level of substantive unconscionability. In light of evidence of an intent to sever any void or voidable provision from the agreement to arbitrate, the Court elects to remedy these issues by ordering this matter to arbitration subject to the following: (a) Defendant is to bear the full costs and expenses associated with the arbitration (though nothing in this ruling is meant to limit the arbitrator's ability to allocate costs and fees based on the prevailing party at a later date); (b) the arbitration provision's strict confidentiality provision is hereby stricken; (c) the arbitrator shall be neutral and agreed upon by both parties; (d) Plaintiff's right to discovery, both in form and volume, is to be identical to those in this Court; (e) any statutory right of Plaintiff to appeal shall be preserved; and (f) all relief available to Plaintiff in this Court shall also be made available to Plaintiff in arbitration.

This matter is hereby stayed pending resolution of the arbitration. An OSC re: dismissal for failure to complete arbitration is set for <u>February 27, 2025, at 10:30 a.m</u>.

# EXHIBIT C

# MEMORANDUM OF
# <u>UNDERSTANDING</u>

This **MEMORANDUM OF UNDERSTANDING** (the "MOU") is entered into on this 23rd day of May, 2023 (the "Effective Date") by, between and among Miller Family Industries, LLC, a Delaware limited liability company having its principal place of business located at 1 North Johnston Avenue, Suite D-304, Hamilton, New Jersey ("MFI"), Christopher Ives, an individual whose address is 6824 Rolando Knolls Drive, La Mesa, California 91942 ("Mr. Ives"), Wendy Peza, an individual whose address is 1504 Collier Street, Unit 10, Austin, Texas 78704 ("Ms. Peza"), and Jenny Merris, an individual whose address is 27 Golf Drive, Aliso Viejo, California 92656 ("Ms. Merris"). The parties hereto are individually referred to as a "Party" and collectively as the "Parties."

**WHEREAS**, the Parties are negotiating to form a limited liability company under the Delaware Limited Liability Company Act (as amended from time to time and any successor statute thereto), 6 Del. Code § 18-101, et seq. (the "**DLLC Act**"), and to engage in any and all activities necessary or incidental thereto (the "**Joint Venture**"); and

**WHEREAS**, the Parties are proposing that the proposed Delaware limited liability company to be formed shall be owned by the Parties in the ownership percentages outlined in Section 1 below; and

**WHEREAS**, upon the formation of the proposed Delaware limited liability company, the Parties propose to enter into an Operating Agreement for the company, as well as a Definitive Agreement regarding the Joint Venture, which will contain material terms as set forth in this MOU, as well as other mutually agreed upon terms relating to the ownership, operation and management of the proposed Delaware limited liability company; and

**WHEREAS**, this MOU is not legally binding upon the Parties, but is merely intended as a term sheet, subject to further written documentation, between the Parties regarding the formation of the proposed Delaware limited liability company and the Joint Venture necessary and/or incidental thereto.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged and for the mutual promises contained herein, and subject to further written documentation, the Parties hereto agree as follows:

1.     <u>**Entity Formation, Ownership and Management.**</u> Within that period which is no more than ninety (90) days after the Effective Date, the Parties shall do all things necessary to cause the proposed limited liability company to be formed under the DLLC Act. Subsequent to formation of the limited liability company, the Parties shall do all things necessary to prepare and enter into a written Operating Agreement, governed by the laws of the State of Delaware. After preparation of the

*Memorandum of Understanding –*
Proposed Joint Venture between
Miller Family Industries, LLC
and Christopher Ives, et al

proposed Operating Agreement, the Parties shall do all things necessary to prepare employment agreements between the proposed Delaware limited liability company, and Mr. Ives, Ms. Peza, Ms. Merris, and Mr. Michael Renteria.

The Parties propose that the business of the limited liability company will be to provide commercial working capital financing products to small businesses and medium sized business across the United States, with the goal of eventually entering international markets as well.

The Parties agree that the initial ownership of the proposed limited liability company shall be structured as follows:

(a)     MFI will initially own 95% of the proposed Delaware limited liability company.

(b)     Mr. Ives, Ms. Peza, and Ms. Merris will jointly own 5% of the proposed Delaware limited liability company.

(c)     The net profits, if any, for the limited liability company shall be divided on a pro rata basis among the respective owners in the allocations as set forth above and pursuant to any additional terms and conditions as shall be contained in the Operating Agreement for the proposed company and/or the Definitive Agreement for the proposed Joint Venture.

The Parties further agree that initial management of the proposed limited liability company will be structured as follows:

(d)     A seven (7) member board of directors shall be appointed for the proposed Delaware limited liability company. The initial members of the board shall be the following:

- Alan J. Miller
- Abraham Miller
- (to be nominated by MFI)
- (to be nominated by MFI)
- Christopher Ives (to be designated as chairman of the board)
- (to be nominated by individual Parties)
- (to be nominated by individual Parties)

(e)     The purpose of the board of directors shall be protecting membership interests, establishing policies for managing the limited liability company, overseeing governance of the limited liability company, overseeing and supervising use of funds and the financial accounts to be maintained by the limited liability company, and making critical business decisions which may

*Memorandum of Understanding –*
Proposed Joint Venture between
Miller Family Industries, LLC
and Christopher Ives, et al

affect the limited liability company.

(f)     The board of directors shall appoint several managers/officers for the company, who will be responsible for conducting the day-to-day operations of the proposed Delaware limited liability company. The initial group of managers/officers shall include the following:

- Christopher Ives, Chief Executive Officer
- Wendy Peza, Chief Operating Officer
- Jenny Merris, Chief Legal Officer; and
- Michael Renteria, Chief Financial Officer

(g)     Subject to their proposed written employment agreements, the managers/officers of the proposed Delaware limited liability company shall operate the company in such manner as will be set forth in the Operating Agreement for the proposed company.

2.     **Contributions and Financing**. Within that period which is no more than ninety (90) days after the formation of the proposed Delaware limited liability company, the Parties shall make the following contributions to and financing for the proposed company:

(a)     The individual Parties will undertake the formation of the proposed Delaware limited liability company; build out the operations of proposed limited liability company, including customer relationship management systems, underwriting procedures, operational processes, loan management and accounting systems, relationships with independent sales organizations and strategic partners, sales training materials, and marketing strategies and grant to the proposed company a license ("License") of CRM, processes, procedures and systems ("Technology") and provide technical support to the proposed company in relation to the Technology.

(b)     MFI will undertake to contribute to the proposed Delaware limited liability company the monthly sum of two to five million ($2,000,000.00 - $5,000,000.00) for operating capital (not including administrative costs for salaries, and other related matters), with the firsts monthly contribution contemplated to begin within ninety (90) days of formation of the proposed company.

(c)     The Parties envisage that MFI will make capital funds available for contribution to the proposed Delaware limited liability company for up to five (5) years after the Effective Date. The proposed cash infusion which could be made available by MFI during that period shall range in the amount of $27,000,000.00 – $65,000,000.00. If operations of the proposed Delaware limited liability company go well, MFI's proposed cash infusion

*Memorandum of Understanding –*
Proposed Joint Venture between
Miller Family Industries, LLC
and Christopher Ives, et al

Page **3** of **8**

will amount to $100,000,000.00.

**3.**    <u>**Additional Ownership Option.**</u> Within eighteen (18) months after the Effective Date, the individual Parties shall receive an additional one and one-quarter percent (1¼%) ownership interest (from 5% to 6.25%) in the proposed Delaware limited liability company.

**4.**    <u>**Definitive Agreement and/or Operating Agreement.**</u> This MOU is subject to further documentation to be negotiated, prepared, and entered into by the Parties. Within ninety (90) days from the date of formation of the proposed Delaware limited liability company, the Parties will negotiate in good faith the Operating Agreement for the proposed company, as well as any Definitive Agreement related to the Parties' Joint Venture. The agreement(s) shall contain the terms set forth herein, as well as other terms to include, but not limited to, restrictions on transfer and voting rights and other mutually agreed upon terms and conditions.

**5.**    <u>**Term.**</u> This MOU shall remain in effect for a period of ninety (90) days from the Effective Date, as may be extended by a mutual written agreement of the Parties (collectively, the "Term"). In the event the Parties fail to enter into an Operating Agreement and/or a Definitive Agreement during the Term, as contemplated herein, then this MOU will terminate and MFI's capital contributions as set forth in paragraph 2 above, and any additional contributions, will be returned to MFI.

**6.**    <u>**Governing Law and Venue.**</u> This MOU and the rights and obligations of the Parties hereunder shall be governed, construed and their provisions interpreted by, under and in accordance with, the laws of the State of Delaware (excluding the laws applicable to conflicts or choice of law). The Parties hereto, to the extent that they may legally do so, hereby irrevocably consent to the exclusive jurisdiction and venue of the state or federal courts of the State of Delaware.

**7.**    <u>**Confidential Information.**</u> The Parties understand and acknowledge that during the Agreement Term, the Parties will have access to and learn about Confidential Information, as defined below.

(a)    **Definition.** For purposes of this Agreement, "**Confidential Information**" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting

*Memorandum of Understanding –*
Proposed Joint Venture between
Miller Family Industries, LLC
and Christopher Ives, et al

information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, of MFI, the individual Parties, their business, and/or their proposed Joint Venture and the proposed Delaware limited liability company, or its businesses, or of any other person or entity that has entrusted information to the Parties in confidence.

The Parties understand that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used. The Parties understand and agree that Confidential Information includes information developed by them during the course of this Agreement.

Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to the Parties; provided that, such disclosure is through no direct or indirect fault of the Parties or person(s) acting on the Parties' behalf.

**(b)**    **Parties Agree not to Disclose Confidential Information.** The Parties agree not to use or disclose Confidential Information other than as permitted or required by this MOU or as required by law. The Parties shall comply with the provisions of this MOU relating to privacy and security of Confidential Information, and shall not disclose to any person, entity, and third-party any information relating to, regarding, and/or arising out of this MOU, the Parties, their business, and/or any agreements/joint ventures/business ventures contemplated by this MOU.

**8**.    **<u>Non-Compete and Non-Solicitation.</u>** Under this MOU, proprietary and Confidential Information will be shared between the Parties for use in evaluating the proposed Joint Venture and potential business relations arising out of same. In order to protect the Parties, they desire to include and incorporate this non-competition and non-solicitation clause into the MOU. The Parties agree to the following:

(a)    At no time during the Term of this MOU will the Parties engage in any business activity which is competitive with their proposed Joint Venture and the proposed Delaware limited liability company. Additionally, for a period of one (1) year immediately following the termination of this MOU, the Parties will not engage in any business activity which competes with the business activities of either MFI or the individual Parties within 50 miles of their principal places of business.

*Memorandum of Understanding –*
Proposed Joint Venture between
Miller Family Industries, LLC
and Christopher Ives, et al

(b)     During the term of this MOU, and for a period of one (1) year immediately thereafter, the Parties shall not, directly or indirectly, disclose to any person, firm or corporation the names or addresses of any of the customers or clients of the Parties, or any other information pertaining to them. And,

(c)     During the term of this MOU, and for a period of one (1) year immediately thereafter, the Parties shall not hire, employ, work alongside, or partner with any current employees, sales staff, or former employees or sales staff of MFI or the individual Parties.

9.     **Successor and Assigns.** The rights of any Party pursuant to this MOU shall not be assigned by any Party, nor may any obligations of any Party be delegated, without the prior written consent of the other Party hereto, which consent shall not be unreasonably withheld. The rights hereunder shall inure to the benefit of, and the o obligations shall be binding upon, the successor of any party hereto as a result of a merger or liquidation, dissolution or the laws of descent and distribution.

10.     **Notices.** Except as otherwise provided in this MOU, any notices required by this MOU to be given to any Party hereto shall be in writing and shall be mailed, by registered, certified or overnight mail, postage prepaid, return receipt requested or sent by national overnight courier to the Party's address set forth in the preamble hereof. Notices shall be deemed to be given two (2) days after the date of mailing in the manner stated above.

11.     **Full Authority to Execute.** Each of the Parties represent and warrant that the person executing this Agreement on its behalf, or in their individual capacity, has the authority to enter into this MOU on its behalf having full knowledge of this MOU, this proposed transaction, and its other material terms and conditions.

12.     **Professional Fees.** Each of the Parties shall be responsible for the payment of their own professional fees with respect to negotiation and analysis of the transactions contemplated by this MOU; provided, however, that if any arbitration or litigation is necessary to interpret or enforce the terms of this MOU, the prevailing party will be entitled to recover its reasonable attorney's fees and costs.

13.     **Section Headings.** Section or other headings contained in this MOU are for reference purposes only and shall not affect in any way the meaning or interpretation of this MOU.

14.     **Amendment.** This MOU may not be amended except by an instrument in writing signed by all the Parties.

*Memorandum of Understanding –*
Proposed Joint Venture between
Miller Family Industries, LLC
and Christopher Ives, et al

15.    **Severability.** Should any part, term or provision of this MOU or any document required herein to be executed be judicially determined by a court of competent jurisdiction and venue to be invalid, void or unenforceable, then all remaining parts, terms and provision hereof shall remain in full force and effect and shall in no way be invalidated, impaired or affected thereby.

16.    **Entire Understanding.** This MOU states the entire understanding reached between and among the Parties with respect to the subject matter hereof, and supersedes any and all other prior or contemporaneous understandings, written or oral.

17.    **No Waiver.** There shall be no waiver of the provisions of this MOU, unless such waiver is made in writing and signed by the waiving Party. No act or omissions by any Party shall be deemed a waiver.

18.    **Counterparts.** This MOU may be executed in one or more counterparts, each of which will be deemed to be an original copy of this MOU and all of which, when taken together, will be deemed to constitute one and the same understanding. This MOU may be executed on signature pages exchanged by facsimile or by electronic transmission in so-called PDF format, each of which shall be deemed originals for purposes of this MOU.

*Remainder of Page Intentionally Left Blank*
*Signature Page to Follow*

*Memorandum of Understanding –*
Proposed Joint Venture between
Miller Family Industries, LLC
and Christopher Ives, et al

IN WITNESS WHEREOF, the Parties hereto have executed this Memorandum of Understanding as of the day and year indicated above as the Effective Date.

MILLER FAMILY INDUSTRIES, LLC:

By: _____
Signature of Recipient's Designated and
Authorized Representative

Its: President
_____
Capacity of Designated Representative

Alan Miller
_____
Printed name of Designated Representative

CHRISTOPHER IVES

_____
Signature of Mr. Ives

WENDY PEZA

_____
Signature of Ms. Peza

JENNY MERRIS

_____
Signature of Ms. Merris

*Memorandum of Understanding* –
Proposed Joint Venture between
Miller Family Industries, LLC
and Christopher Ives, et al

Page **8** of **8**

# EXHIBIT D

| | |
|---|---|
| **From:** | Christopher Ives |
| **To:** | ajm@mfamilyindustries.com |
| **Subject:** | Re: Follow-up Conversation |

Alan,

We can agree to the start of 5% equity and the additional 1.25% as we grow. The salary adjustments  I believe the only thing left would be the proper adjustment of the starting salaries of the executives to be in line with industry given the investment size and growth potential. We lowered them with expectation of a higher percentage. This will not be anything egregious, and will still be within the original budget shared with you and your team. We can easily finalize salaries in the employment contracts.

I am responding only to you at this time to make sure you and I are on the same page before announcing to the teams we are agreed.. Unless I am mistaken, I feel we are crossing the finish line.

I will be in NY this weekend and Monday, and am excited to finally connect in person. My cell number is 480-221-6552, please feel free to reach out.

I look forward to hearing from you.

Thank you.


On Fri, May 5, 2023 at 12:44 PM Alan Miller <ajm@mfamilyindustries.com> wrote:
> Chris & Wendy,
>
>    I am receipt of you current communications
> and I wanted to share my enthusiasm with you. I agree that united we will have unlimited
> potential to grow our loan company into a formidable powerhouse offering not only the
> current loan offerings but other loan products that will complement each other. I believe we
> are aligned in the same values and have a shared understanding on the growth and a five to 7
> year exit strategy. We clearly have confidence in your team's ability. We will bring our
> corporate strength (and eventually additional investment funds) to help the continued growth
> appetite.
>
>    We have spent the better part of the morning reviewing your counter proposal and have
> been unable to reach your desired request. We will however offer the following;
> We would raise your three salaries 10% after the first seven months and an additional 5%
> after the passing of the first 15 months. Additionally, we will add an additional 1/4 of a point
> profit/ownership after the first eighteen month cycle is completed. Please be mindful that we
> will be offering other loan tracks allowing us to deploy more capital and in return see
> additional 2-3 times more profit then our current projections (this will however take several
> months to establish but in my opinion all part of the grand plan).
>
>    This is truly our final offer and I look forward to a long and prosperous relationship.
>
>
> Warmest regards!

Alan Miller
917.355.5929

On May 5, 2023, at 3:09 PM, Julia Hogan <jhogan@mfamilyindustries.com>
wrote:

---------- Forwarded message ---------
From: **Wendy Peza** <wendypeza@gmail.com>
Date: Thu, May 4, 2023 at 5:05 PM
Subject: Re: Follow-up Conversation
To: Julia Hogan <jhogan@mfamilyindustries.com>
CC: crives@gmail.com <crives@gmail.com>, Alan Miller
<ajm@mfamilyindustries.com>, Abe Miller
<abe.miller@mfamilyindustries.com>

Hey all,

Apologies on the delay - our team is very excited and we've already begun
conversations with partners (without details, of course), to get them excited and
on board. Christopher has been in those meetings this morning, so again, our
apologies for the wait.

We agree to the 5% equity to start with and an equity bonus once your initial
capital has been returned - we ran the numbers and the time frame is very
similar to our original request of getting the bonus when we deploy a certain
amount. However, we ask for the bonus to be 2%, totaling 7%, after your
original capital investment returns - we are anticipating this to be in about 18 -
24 months from launch. Of course, in the meantime we would not be getting
dividends, so we ask for a salary increase for the first year, to match our
historical rates. After the first year, we will reconsider our base pay as we'll be
getting a share of the profit and it is reasonable for us to reduce the base. We
also kindly request for the possibility for us to buy more equity down the line.
We realize that the value of the company will increase exponentially and are
hoping that given the sweat equity we will be putting in to build it, to purchase
equity at the current valuation.

We know the immense opportunity that we all have here and are confident that
together we will build one of the biggest lenders in our space.

Provided that all of the above works for your team, we'd like to move forward right away. In the meantime, I will check with Jenny on the MOU - she should have it ready.

Thank you again,

On Thu, May 4, 2023 at 1:57 PM Julia Hogan <jhogan@mfamilyindustries.com> wrote:

Hello,
Alan received your email last night and would like a status update.  Also, he is waiting on the MOU to be sent over.
Thank you





**Julia Hogan**
**Executive Assistant to the International Director of Operations and Special Project Liaison, Miller Family Industries**

Office 212-220-1616 Ext 4007  |  Mobile 215-237-5139

www.Millerfamilyindustries.com  |  jhogan@mfamilyindustries.com

HQ: 1 N Johnston Avenue Suite D-304 Hamilton, NJ 08610

Finance Office: 400 Boulevard of the Americas Suite 301A Lakewood, NJ 08701

"A family of forward thinkers"

App Banner Image



Create your own email signature



On Wed, May 3, 2023 at 7:29 PM Wendy Peza <wendypeza@gmail.com>
wrote:
  Hey all,

  We just had a meeting - our team is very excited - I think we are very
  close!

  Christopher will send over the updated terms first thing in the morning
  tomorrow. We should have the MOU by then as well.

  Thank you again and looking forward to getting this started.

  Best,

  On Wed, May 3, 2023 at 1:53 PM Wendy Peza <wendypeza@gmail.com>
  wrote:
    Hi all,

    We just received this and are looking over now!

Thank you for the timely response and consideration - we'll get together internally and get back to you shortly.

Best Regards,
Wendy

On Wed, May 3, 2023 at 12:48 PM Julia Hogan <jhogan@mfamilyindustries.com> wrote:

May 3, 2023

From: The office of Alan Miller -

Dear Chris & Wendy,

Thank you, for taking the time to speak with the team and I. We hope that we will be able to move at a positive and productive pace, in the latter part of our conversation we discussed your counter offer. We understand what you and your team bring as far as opportunity, profitability and time saving measures. We are confident of our original offer at 4% of profits. Given the opportunity that we are providing to you and your team including; generous salaries and the ability to continue operations locally have been more than amicable, fair and very generous. Our intent is to deploy of our own capital between sixty to one-hundred million dollars allowing us to reach our desired goal of two to five million **fresh** investment capital per month. This amount together with your industry know-how & technique would allow us to compound growing exponentially further. However, in the interest of making a deal and demonstrating our trust in your abilities we will counter your offer as follows. We are willing to start with a shared profit amount of 5% as of day one of operations and move to a 6% after our original capital has been returned (assuming somewhere between eighteen and twenty-four months). We will do our best to implement a bi-annual distributions (we understand the first small distributions won't be before the first twelve to fifteen months). You and your team are our preferred option for acquisition but we are actively looking at other options. I hope you take the time to evaluate and appreciate your opportunity in partnering with us the value we bring to you and your team in building a home within our organization. I believe together with both our strengths we can quickly ascend to one of the largest prime lenders within the cash advance space.



**Julia Hogan**
Executive Assistant to the International Director of Operations
and Special Project Liaison, Miller Family Industries

photo

Office 212-220-1616 Ext 4007  |  Mobile 215-237-5139

www.Millerfamilyindustries.com  |  jhogan@mfamilyindustries.com

HQ: 1 N Johnston Avenue Suite D-304 Hamilton, NJ 08610

Finance Office: 400 Boulevard of the Americas Suite 301A Lakewood, NJ 08701

"A family of forward thinkers"

App Banner Image



Create your own email signature

--

**Julia Hogan**

**Executive Assistant to the International Director of Operations and Special Project Liaison, Miller Family Industries**

Office 212-220-1616 Ext 4007  |  Mobile 215-237-5139

www.Millerfamilyindustries.com  |  jhogan@mfamilyindustries.com

HQ: 1 N Johnston Avenue Suite D-304 Hamilton, NJ 08610

Finance Office: 400 Boulevard of the Americas Suite 301A Lakewood, NJ 08701

"A family of forward thinkers"

App Banner Image



Create your own email signature



# EXHIBIT E

# MEETING MINUTES FOR
## [Miller Family Industries]

**I. MEETING DETAILS**

Meeting Facilitator: Alan Miller
Secretary: Julia Hogan

Date: May 1, 2023
Time: 3:00pm EST

Location: Google Meet

**II. ATTENDEES**.

Alan Miller
Abe Miller
Daneane Hogan
Gabriela Lavin
Julia Hogan
Wendy Peza
Chris Rives

**III. NEW BUSINESS**.

- We are a conglomerate and Miller Family Industries is the main umbrella company
- Wendy and Chris have extensive history in the MCA industry
- Both worked for a top 5 lender but they ran into some issues and closed their doors
- They are looking to open their own business
- The idea is to let Chris, Wendy and their team run independently
- We are going to push $2M-$5M fresh capital every month
- Abe has worked up a fund
- In the beginning we will look at the grade A and A- paper
  - Then as opportunities open we will delve more into the B and B- paper
- There is no need for two HR managers
- Will keep a controller/CFO independent
  - Will need to see what company they work for
  - Wendy said the CFO they have in mind has a lot of experience in this specific industry
    - They can do weekly or monthly reports to our finance team
  - They are looking to hire Michael Renteria
- The name of the company is going to be Levo
  - There is no company under this name for the industry they are in
  - They have the freedom to grow the brand
- They will be an independent division of Miller Family Industries
- Wendy spoke with Alan and Gabbi about not hiring the admin in the beginning
  - Also about not hiring too many sales people
- The lending part will grow faster than the direct sales part
- A lot of the major players in the industry are taking a hit
  - The cost of money has skyrocketed



- All of the major players that are tied to large equity lines to the banks are eating it on their margins
- There is a consolidation on the front end of the pipeline where lead sources are consolidating and driving up their prices
- Employees
  - Chris, Jenny (attorney), Wendy, Carrie (underwriter), Michael (CFO), John, Merrit, Sarah, Tyler and Jeff
    - Jenny will need to collaborate with our legal department
    - Michael will be trained by our team
    - The direct salespeople they would like to hire are Foreman, Owen, and Brock
- We have a good collections department so we will keep this in house
- Will start deploying $2M a month until things ramp up
  - After the initial 30 days Wendy believes $2.5M would be good
  - Should be able to get to $5M relatively quickly
  - We can control our growth rate by how many ISOs we bring on board
- Wendy and Chris are not employees
  - They will have a percentage of ownership
  - They will sign noncompete
- Alan and Abe willing to deploy $100M to start
- When we pass the $100M there are investors willing to invest
- Once we cross the $60M dollar line, we are talking about deploying $15M-$16M a month
- It took Wendy and Chris 4 years to reach the $100M line with Reliant
  - That was with doing some things incorrectly
  - They were restricted in terms of cash flow
- In the first year they can probably do about $50M with just fresh cash
- They will get 4% ownership with a bonus structure as we go
- They are open to a clause to add in another point or two in ownership if they exceed expectations
  - Could also be cash
  - Wendy and Chris will discuss this
- Their percentage will be owned by an LLC
  - Alan wants full disclosure
- Jenny is working on the MOU
  - Will get it to Alan and Abe by the end of the week
- Chris and Alan will get together in New York Monday

Minutes submitted by: _____ Print Name: _____

Approved by: _____ Print Name: _____

# EXHIBIT F

| | |
|---|---|
| **From:** | Gabbi Lavin |
| **To:** | Wendy Peza |
| **Cc:** | Alan Miller; Christopher Ives; Abe Miller |
| **Subject:** | Re: Requested Numbers |
| **Date:** | Tuesday, May 9, 2023 11:19:37 AM |

Hi Wendy,

In review of this MOA, Miller Family is agreeable to the basic percentages and ownership percentages.

However, the rest of the structure needs to be revised. Can you please work with me in scheduling a private conversation between Jenny and Alan?



**Gabriela Lavin**
**International Director of Operations and Sr. Intake Officer, Miller Family Industries**

267-981-0960  |  www.Millerfamilyindustries.com

glavin@mfamilyindustries.com

HQ: 1 N Johnston Ave Suite D-304 Hamilton, NJ 08609

Finance Office: 400 Boulevard of the Americas Suite 3-1A Lakewood, NJ 08701

"A family of forward thinkers"

App Banner Image

Create your own email signature



On Mon, May 8, 2023 at 9:55 PM Wendy Peza <wendypeza@gmail.com> wrote:
> Good evening all,
>
> Please find the MOU attached.
>
> A few notes:
> 1. We put in 6.25% ownership, however in the operating agreement we can expand on the schedule (at first 5%)
> 2. We have 3 directors from Miller Family on the board, does this number work for you? We can adjust as needed.
> 4. We wrote the $100MM commitment, however not a clear schedule - again this is something we can expand on in the operating/shareholder agreement.
>
> I am sending a word version so you can redline and send back to us.
>
> Let me know if there is anything else I can help with in the meantime!
>
> Thank you,
>
> On Mon, May 8, 2023 at 6:09 PM Wendy Peza <wendypeza@gmail.com> wrote:
>> Thanks, Gabbi - I am just going through and adding the names and will send over to you all for review.
>>
>> On Mon, May 8, 2023 at 5:58 PM Gabbi Lavin <glavin@mfamilyindustries.com> wrote:
>>> Hi Wendy,
>>>
>>> Yes, please use Miller Family Industries for the MOU.
>>>
>>>
>>> 
>>> **Gabriela Lavin**
>>> **International Director of Operations and Sr. Intake Officer, Miller Family Industries**
>>>
>>> 267-981-0960  |  www.Millerfamilyindustries.com
>>> glavin@mfamilyindustries.com
>>> HQ: 1 N Johnston Ave Suite D-304 Hamilton, NJ 08609
>>> Finance Office: 400 Boulevard of the Americas Suite 3-1A Lakewood, NJ 08701
>>> "A family of forward thinkers"

App Banner Image



Create your own email signature



On Mon, May 8, 2023 at 6:15 PM Wendy Peza <wendypeza@gmail.com> wrote:
> Absolutely, it's been my pleasure! Here are the answers to the questions above.

1. We calculated default as a percentage of the dollars we lent out - we can adjust the default to be a percent of RTR but that percentage would be quite a bit lower as the denominator increases. Companies can do this a number of different ways and at a number of different times (ie. when we choose to write off). We will collaborate with your team on how the reporting works best with your current accounting.

2. For simplicity's sake we broke it down to assume all $5 MM is lent day one of each month - of course this is not realistic, however illustrates the compounding effect and general course of where we anticipate to be in different time frames. I had previously created an in depth waterfall model of each deal and was requested a simpler, monthly breakdown to show the general overview. If you'd like I can re-do the waterfall model, however will take me a few days as I will collaborate with Michael.

3. This depends on the time frame - at 60 months for instance, your return is actually 44%, at 72 months it is 77% and 84 months 111%. Meaning an additional 34% return each year after the initial investment has been returned - this makes sense as $9MM is approximately 34% of $27MM. Again to highlight, this is assuming no renewals and

that no additional capital is injected - the latter being very important as a part of our equity agreement was an initial valuation based on the ability to access over $100MM.

Let me know if there are any other questions I can answer or if you'd like to hop on a call to go over any details!

Quick questions for you all - we are writing M Family Industries on the MOU - does that work or should we use another company name?

Thank you,

On Mon, May 8, 2023 at 3:28 PM Gabbi Lavin <glavin@mfamilyindustries.com> wrote:

Hi Wendy,

The team thanks you for all the effort you put into getting these projections done promptly. Please see below points of questions that are from our finance department. If you could reply all to this email that would be great!

1. The RTR they use after bad debts, is writing off ~10% of the principal. If they are subtracting it from the RTR, it should be subtracted using 10% of the RTR, not the principal

2. The payments received during the month, would only include half of that month's lending due. We are assuming that all $5 mil that is loaned, is loaned evenly over the month and not on day 1. Therefore, in the first month, we would only receive $300k, not $600k, every month would continuously be short that $300k. The following month, we would receive $300k less than what they say is "payment received" as well .It would not build up – just every month is $300k less than what they state -which would be collected the next month. And those funds would be collected in the first half of the following month -and therefore be available during the 2nd half of the month to continue funding after the initial monthly investment by M Family is used up.

3.  This seems to support a ~30% return. If every 6 months (after a year) we profit $6 mil on the lending, and our expenses are $1.5 mil -we are left with $4.5 mil profit - for 6 months. For a year, that doubles to $9 mil. And $9 mil profit from $27 mil investment is around 30% return on $27 mil investment – again, after a year.

Please note these questions are just so that we can get a better of the excel sheets provided.

If you have any follow up questions please let me know!



**Gabriela Lavin**
**International Director of Operations and Sr. Intake Officer, Miller Family Industries**

267-981-0960  |  www.Millerfamilyindustries.com

glavin@mfamilyindustries.com

HQ: 1 N Johnston Ave Suite D-304 Hamilton, NJ 08609

Finance Office: 400 Boulevard of the Americas Suite 3-1A Lakewood, NJ 08701

"A family of forward thinkers"



Create your own email signature



On Mon, May 8, 2023 at 12:14 PM Wendy Peza <wendypeza@gmail.com> wrote:

Hi Alan,

Please find the requested numbers below - capital investment of $27.55 MM with no additional cash injection and how we would deploy it over 18 months and beyond.

Let me know if you have any questions!

Best,